E95AABENP                    Plea

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4         v.                           14 CR 203 (RJS)

 5   DARRELL BENNETT,

 6               Defendant.

 7   ------------------------------x

 8                                      New York, N.Y.
                                        September 5, 2014
 9                                      10:15 a.m.

10

     Before:
11
                        HON. RICHARD J. SULLIVAN,
12
                                             District Judge
13

14                            APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     EUN YOUNG CHOI
17        Assistant United States Attorney

18   PEGGY CROSS-GOLDENBERG
          Attorney for Defendant Bennett
19

20

21

22

23

24

25

1       (Case called)

2           MS. CHOI:  Eun Choi, on behalf of the government.

3           THE COURT:  Ms. Choi, good morning to you.

4           And for the defendant?

5           MS. CROSS-GOLDENBERG:  The Federal Defenders of New

6   York by Peggy Cross-Goldenberg.  With me at counsel table with

7   your Honor's permission is Siju Moore of our office who is not

8   yet admitted to this bar, although he is admitted in other

9   states.

10          THE COURT:  Mr. Moore, good morning.

11          Everyone, good morning.

12          Mr. Bennett, good morning to you.

13          THE DEFENDANT:  Good morning, your Honor, sir.

14          THE COURT:  As I understand it, Mr. Bennett wishes to

15  withdraw his previously entered plea of not guilty and plead

16  guilty to Count One of the indictment; is that correct?

17  Information.

18          MS. CROSS-GOLDENBERG:  That's correct, your Honor, the

19  information, yes, that's correct.

20          THE COURT:  All right.  Mr. Bennett, before I accept

21  your guilty plea I am going to ask you some questions here in

22  court and the purpose of these questions here is really

23  two-fold.  First, to make sure that you fully understand your

24  rights, that you have of a defendant in a criminal case.  And

25  second to make sure that you are pleading guilty because you

1    are guilty and not for some other reason.  If as I am asking

2    you these questions you don't understand the question, let me

3    know that.  I'll rephrase it or explain it better.  If at any

4    point you want to confer with Ms. Cross-Goldenberg or Mr. Moore

5    or both before answering questions, that's fine.  I'll give you

6    as much time as you need.

7            In a moment I'm going to ask you to take an oath and

8    this will be an oath that you will truthfully answer the

9    questions that I put to you.  If after taking that oath you

10   were to make any false statements here in court that would be a

11   separate crime, the crime of perjury or obstruction of justice.

12   And I tell you that not to scare you but just to remind you

13   that it's very important that you be careful and deliberate and

14   complete and truthful in all your answers to my questions.  OK?

15           THE DEFENDANT:  Yes, sir.

16           THE COURT:  Any questions so far?

17           THE DEFENDANT:  No, sir, your Honor.

18           THE COURT:  All right.  So let me ask you to stand and

19   if you could raise your right hand.

20           (Defendant Darrell Bennett sworn)

21           THE COURT:  OK.  All right.  Have a seat.

22           Could you tell me your full name, Mr. Bennett.

23           THE DEFENDANT:  Darrell J. Bennett, Jr., sir.

24           THE COURT:  How old are you?

25           THE DEFENDANT:  29 years old.

1          THE COURT:  How far did you go in school?

2          THE DEFENDANT:  Law school, your Honor.

3          THE COURT:  That's right.  I remember that.  Are you

4     now or have you recently been under the care of a doctor or a I

5     psychiatrist?

6          THE DEFENDANT:  Yes, sir, your Honor.

7          THE COURT:  OK.  And tell me about that.  What's the

8     nature of the treatment that you are getting?

9          THE DEFENDANT:  It's court mandated weekly sessions

10    with a young lady by the name of Drea Poppavick.

11         THE COURT:  That's since you were arrested in this

12    case?

13         THE DEFENDANT:  Yes, sir, your Honor.

14         THE COURT:  Prior to that have you been under the care

15    of or treatment of a doctor or psychiatrist?

16         THE DEFENDANT:  Yes, sir, your Honor.

17         THE COURT:  OK.

18         THE DEFENDANT:  At Harlem Hospital clinic.

19         THE COURT:  What's the nature of the treatment there?

20         THE DEFENDANT:  I was being assessed because I was

21    having problems sleeping, your Honor.

22         THE COURT:  OK.  And are you taking any medication for

23    any of this treatment?

24         THE DEFENDANT:  Yes, sir, your Honor.  I take

25    Seroquel.

1          THE COURT:  What is that?  To help you sleep?

2          THE DEFENDANT:  Yes, sir, your Honor.

3          THE COURT:  How often do you take it?

4          THE DEFENDANT:  Nightly.

5          THE COURT:  Every night?

6          THE DEFENDANT:  Pretty much so.

7          THE COURT:  Does that drug affect your memory, your

8   judgment, your ability to think clearly at all?

9          THE DEFENDANT:  No, sir, your Honor.

10          THE COURT:  You took it last night?

11          THE DEFENDANT:  Yes, sir.

12          THE COURT:  Are there any other medications that you

13   are taking at this time?

14          THE DEFENDANT:  No, sir, your Honor.

15          THE COURT:  All right.  Have you ever been treated or

16   hospitalized for any kind of mental illness?

17          THE DEFENDANT:  Yes, sir, your Honor.

18          THE COURT:  Tell me about that.

19          THE DEFENDANT:  It happened in my last year at law

20   school.  I was facing some depression and I went to see someone

21   but I only stayed for the day.

22          THE COURT:  All right.  And that was about how long

23   ago, approximately?

24          THE DEFENDANT:  2010, your Honor.

25          THE COURT:  All right.  And was there any medication

1   that you were prescribed in connection with that?

2          THE DEFENDANT:  No, sir, your Honor.

3          THE COURT:  All right.  Have you ever been treated or

4   hospitalized for any kind of substance abuse?

5          THE DEFENDANT:  No, sir, your Honor.

6          THE COURT:  OK.  In the last two days other than the

7   medication you took last night, have you taken any alcohol or

8   pills or drugs or medicines of any kind?

9          THE DEFENDANT:  No, sir, your Honor.

10          THE COURT:  Is your mind clear today, Mr. Bennett?

11          THE DEFENDANT:  Yes, sir, your Honor.

12          THE COURT:  Do you understand the nature of this

13   proceeding and what's going to take place here today?

14          THE DEFENDANT:  Yes, sir, I do.

15          THE COURT:  Ms. Cross-Goldenberg, do you have any

16   doubts as to Mr. Bennett's mental competence or his ability to

17   enter an informed plea?

18          MS. CROSS-GOLDENBERG:  No, your Honor.

19          THE COURT:  Ms. Choi, do you have doubts?

20          MS. CHOI:  No, your Honor.

21          THE COURT:  All right.  Neither do I.  Based on

22   Mr. Bennett's representations and responses to my questions

23   today, based on his demeanor today and on prior occasions when

24   I've seen him, based also on the representations of counsel and

25   the government lawyer, I find that Mr. Bennett is fully

1    competent to enter an informed plea.

2              So Mr. Bennett, as I understand you wish to plead

3    guilty to see to Count One of the information, is that correct?

4              THE DEFENDANT:  Yes, sir, your Honor.

5              THE COURT:  All right.  Do you feel you have had

6    enough time to consider this case and in any possible defenses

7    you might have to the charges in this information?

8              THE DEFENDANT:  Yes, sir, your Honor, I have.

9              THE COURT:  Have you had enough time to discuss that

10   with your attorney, Ms. Cross Goldenberg?

11             THE DEFENDANT:  Yes, sir, your Honor.

12             THE COURT:  Are you satisfied with Ms. Cross

13   Goldenberg's representation of?

14             THE DEFENDANT:  Yes, sir, your Honor.

15             THE COURT:  Well, what I want to do now is I want to

16   describe for you certain rights that you have as a defendant in

17   the case.  And I'm going do that in two ways.  First I am going

18   to ask you about a document which I think that you should have

19   in front of you and it's called an Advice of Rights form.  Do

20   you see that?

21             THE DEFENDANT:  Yes, sir, your Honor.

22             THE COURT:  I'm going to ask you about that document,

23   then I'll also ask you some questions here in open court that

24   will cover a lot of the same grounds.  And I do that because

25   these rights are so important and your understanding is so

1    crucial I don't want to leave anything to chance.  So let's

2    start with that form, the Advice of Rights form.  Is that your

3    name on the second page?  Is that your signature?

4              THE DEFENDANT:  Yes, sir your Honor.

5              THE COURT:  Before you signed that document did you

6    read it?

7              THE DEFENDANT:  Yes, sir, your Honor.

8              THE COURT:  And did you have an opportunity to discuss

9    it with Ms. Cross Goldenberg?

10             THE DEFENDANT:  Yes, sir, your Honor.

11             THE COURT:  You were able to ask her any questions

12   about what that document means or what the rights described in

13   that document entail, is that true?

14             THE DEFENDANT:  Yes, sir, your Honor.

15             THE COURT:  All right.  And Ms. Cross Goldenberg, is

16   your signature on the document as well?

17             MS. CROSS-GOLDENBERG:  Yes, your Honor.

18             THE COURT:  Before you signed it you reviewed it your

19   client?

20             MS. CROSS-GOLDENBERG:  Yes, your Honor.

21             THE COURT:  You were able to answer any questions that

22   he had?

23             MS. CROSS-GOLDENBERG:  Yes.

24             THE COURT:  If you would hand that up to me I'll mark

25   it as a Court Exhibit.  I'll call it Court Exhibit One and I'll

 1   date and initial it.

 2          But as I said, Mr. Bennett, sometimes what looks clear

 3   as a bell, clear as day on a two-page form when you hear the

 4   rights described in open court sometimes it prompts further

 5   questions.  If that's the case here, don't be shy.  We're in no

 6   rush.  It's really important that you understand these rights.

 7   You're an attorney and you've studied the law so you are

 8   probably more sophisticated than most but that doesn't mean you

 9   won't have questions.  And in same ways your training might

10   make you have more questions.  There's nothing wrong with that.

11   OK?

12          THE DEFENDANT:  Yes, sir, your Honor.

13          THE COURT:  Well, the first right that I want to

14   discuss with you is a pretty basic one.  Under the Constitution

15   you have the right to a speedy and public trial by a jury on

16   the charges contained in the information.  Do you understand

17   that?

18          THE DEFENDANT:  Yes, sir, your Honor.

19          THE COURT:  At trial you would be presumed to be

20   innocent and the government would have the burden of

21   introducing competent evidence to prove that you were guilty

22   beyond a reasonable doubt; do you understand that?

23          THE DEFENDANT:  Yes, sir, your Honor.

24          THE COURT:  The jury would have to be convinced beyond

25   a reasonable doubt and they would have to be unanimous on that

1   point before you could be found guilty; do you understand that?

2              THE DEFENDANT:  Yes, sir, your Honor.

3              THE COURT:  You wouldn't have to do anything.  You

4   wouldn't have to prove that you were innocent if you went to

5   trial; do you understand that?

6              THE DEFENDANT:  Yes, sir, your Honor.

7              THE COURT:  The burden would always be on the

8   government to prove its case, to prove your guilt beyond a

9   reasonable doubt.  Now at trial and at every stage of your case

10  you would be entitled to be represented by attorney.  And if

11  you couldn't afford an attorney then one would be appointed for

12  you at no cost to you; do you understand that?

13             THE DEFENDANT:  Yes, sir, your Honor.

14             THE COURT:  And in this case Ms. Cross-Goldenberg has

15  been appointed to represent you at no cost to you, correct?

16             THE DEFENDANT:  Yes, sir, your Honor.

17             THE COURT:  All right.  Now, if there were a trial

18  then the witnesses for the government would have to come into

19  court and they would have to testify here in your presence; do

20  you understand that?

21             THE DEFENDANT:  Yes, sir, your Honor.

22             THE COURT:  That's because as I think you probably

23  know, you have a right to confront your accusers and that would

24  mean that you would have the right to hear and see the

25  testimony of the witnesses that the government brought in.

1    They'd sit here in this witness box.  You could see their

2    testimony and hear their testimony.  That would be your right.

3    Do you understand that?

4             THE DEFENDANT:  Yes, sir, your Honor.

5             THE COURT:  At trial your attorney,

6    Ms. Cross-Goldenberg, if there were a trial, would have the

7    opportunity to cross-examine those witnesses, to ask them

8    questions, to test their veracity, to test their accuracy, to

9    test what they know, what they're talking about.  She'd have

10   the opportunity to object to the government's evidence if they

11   thought there was a basis to do so; do you understand that?

12            THE DEFENDANT:  Yes, sir, your Honor.

13            THE COURT:  Now you yourself if you wanted to you

14   could call witnesses and you could introduce evidence; do you

15   understand that?

16            THE DEFENDANT:  Yes, sir.

17            THE COURT:  You wouldn't have to.  You would have no

18   obligation to do anything.  You could sit silently and do

19   nothing.  But if you wanted to you could put on a case, call

20   witnesses, introduce evidence.  Do you understand that?

21            THE DEFENDANT:  Yes, sir, your Honor.

22            THE COURT:  Now, if there were witnesses that you

23   wanted to call as part of your case and they told you no way, I

24   am not coming to court, that's the last place I want to be, I

25   won't come, well, that wouldn't be the end of the story because

1    if they had that attitude you could issue subpoenas or have

2    other process used to compel them to come to court and to

3    testify truthfully under oath.  Do you understand that?

4              THE DEFENDANT:  Yes, sir, your Honor.

5              THE COURT:  You yourself would have the right to

6    testify at trial if you wanted to but you'd also have the right

7    not to testify.  And if you chose not to testify the jury could

8    attach no significance to that fact.  Do you understand that?

9              THE DEFENDANT:  Yes, your Honor.

10             THE COURT:  I would tell the jury as I do in every

11   case that goes to trial that the defendant is presumed

12   innocent, the defendant has no burden to put on any evidence at

13   all.  The burden always rests with the government.  And if the

14   defendant chooses not to testify you, the jury, may attach no

15   significance to that fact.  Do you understand that?

16             THE DEFENDANT:  Yes, sir your Honor.

17             THE COURT:  Now, if the jury returned a guilty verdict

18   against you you then would have the right to appeal the jury's

19   verdict.  Do you understand that?

20             THE DEFENDANT:  Yes, sir, your Honor.

21             THE COURT:  I guess you could first ask me to overturn

22   the jury's verdict and if I conclude there was insufficient

23   evidence I could do that.  But if I decline to do that you

24   would then have the right to appeal above me to the Court of

25   Appeals and ask the Court of Appeals to overturn the verdict or

1    to order a new trial based on errors or other things that

2    happened at trial.  Do you understand that?

3              THE DEFENDANT:  Yes, sir, your Honor.

4              THE COURT:  Even now, Mr. Bennett, as you are

5    preparing enter a guilty plea you have the right to change your

6    mind.  We haven't yet crossed the point of no return.  If you

7    told me right now, I changed my mind, I'd like to go forward

8    with trial, that would be fine.  I wouldn't be upset with you.

9    Your lawyers would not be upset with you, nor would the

10   government's lawyer.  We all understand this is your decision

11   and we respect whatever decision you make.  Do you understand

12   that?

13             THE DEFENDANT:  Yes, sir, your Honor.

14             THE COURT:  Do you nevertheless want to go forward

15   with a guilty plea at this time?

16             THE DEFENDANT:  Yes, sir, your Honor.

17             THE COURT:  Do you understand that if you plead guilty

18   that means there will be no trial in this case?

19             THE DEFENDANT:  Yes, sir.

20             THE COURT:  You will have waived your right to a trial

21   and all the other rights that I just mentioned.  Do you

22   understand that?

23             THE DEFENDANT:  Yes, sir, your Honor.

24             THE COURT:  I guess the only exception to that would

25   you be your right to counsel which would continue.  You

1    wouldn't waive that right.  Ms. Cross-Goldenberg would continue

2    to represent you today through the plea and also through

3    sentencing and through an appeal if there were appeal.  And

4    your right to appeal would not be waived.  Though by leading

5    guilty you almost certainly wouldn't be able to appeal whether

6    or not you committed this crime.  You might be able to appeal

7    the sentence or some other things but probably not the fact of

8    committing the crime.  Do you understand that?

9              THE DEFENDANT:  Yes, sir, your Honor.

10             THE COURT:  You should also know that by pleading

11   guilty that you will then be sentenced on the basis of that

12   guilty plea.  Not today but ultimately the sentence I impose

13   will reflect the crime that you've pled guilty to.  Do you

14   understand that?

15             THE DEFENDANT:  Yes, sir, your Honor.

16             THE COURT:  I guess this last point I want to make

17   sure you understand is that before I will accept your guilty

18   plea I'm going to ask you to tell me what you did that makes

19   you guilty of this crime.  And the reason I do that is to

20   satisfy myself that you are pleading guilty because you are

21   guilty and not for some other reason.  But in asking you to

22   tell me what you did that makes you guilty of this crime I am

23   asking you to give up an important right and that's your right

24   not to incriminate yourself.  So I want to make sure you are

25   prepared to do that, you understand you have that right but

1  that you'd giving up that right in order to tell me what I need

2  to hear to accept your guilty plea.  Do you understand that?

3           THE DEFENDANT:  Yes, sir, your Honor.

4           THE COURT:  And you are prepared to do that?

5           THE DEFENDANT:  Yes, sir, your Honor.

6           THE COURT:  OK.  Do you have any questions about any

7  of these rights, Mr. Bennett?

8           THE DEFENDANT:  No, sir, your Honor.

9           THE COURT:  All right.  And you want to proceed with

10  the guilty plea at this time?

11           THE DEFENDANT:  Yes, sir, your Honor.

12           THE COURT:  OK.  Well, let's take a minute to talk

13  about the charge against you.  You have been charged in an

14  information and I think I explained information to you before

15  but have you received a copy of the information and read it?

16           THE DEFENDANT:  Yes, sir, your Honor.

17           THE COURT:  You've discussed it with

18  Ms. Cross-Goldenberg?

19           THE DEFENDANT:  Yes, sir, your Honor.

20           THE COURT:  And you are charged with in one count with

21  possessing and accessing child pornography, a violation of

22  Title 18 U.S.C. Section 2252(A) sub A Section 5B.  That's what

23  you've been charged with.  Do you understand that?

24           THE DEFENDANT:  Yes, sir, your Honor.

25           THE COURT:  All right.  Now I am going to ask Ms. Choi

1   to summarize the elements of this crime.  If any one of these

2   elements was not found by the jury beyond a reasonable doubt

3   you couldn't be convicted at trial and if any one of these

4   elements are not demonstrated to my satisfaction then I

5   couldn't accept your guilty plea.  So these are the elements.

6   Listen carefully to Ms. Choi as she summarizes them.  If when

7   she's finished you have any questions, let me know.

8               THE DEFENDANT:  Yes, sir.

9               MS. CHOI:  Your Honor, at trial the government would

10  have to the prove four elements beyond a reasonable doubt.

11              First, that the defendant knowingly possessed or

12  knowingly accessed a visual depiction which is defined as any

13  photograph, film video or picture including undeveloped film or

14  videotape and data stored on a computer disk or by electronic

15  means which is capable of conversion into a visual image.

16              Second, the visual depiction was transported in or

17  effecting interstate or foreign commerce or was produced using

18  materials that had been transported in or effecting interstate

19  or foreign commerce.

20              Third, that the visual depiction was child pornography

21  which means the production of visual depiction involved the use

22  of a minor engaging in sexually explicit conduct and portrayed

23  the minor engaging in that conduct.

24              Fourth, the defendant knew of the sexually explicit

25  nature of the material and the visual depiction was of an

1    actual minor engaged in sexually explicit conduct.

2              THE COURT:  All right.  So those are the elements.  Do

3    you have any questions about those elements, Mr. Bennett?

4              THE DEFENDANT:  No, sir, I don't.

5              THE COURT:  I guess there's one other thing the

6    government would have to prove at trial and that is that some

7    or part of this crime took place in the Southern District of

8    New York and that's known as the venue requirement.  I think

9    you understand this but the United States is divided up into

10   about 95 districts.  We're in the Southern District of New York

11   which is Manhattan, the Bronx, Westchester, Rockland, Orange,

12   Putnam and a few other counties.  If it all took place in New

13   Jersey then it couldn't be charged here.  That venue

14   requirement doesn't have to be proven beyond a reasonable

15   doubt.  All the other elements that Ms. Choi mentioned would

16   have to be demonstrated beyond a reasonable doubt.  Venue, the

17   standard is lower by a preponderance of the evidence.  So it

18   just means that the greater weight of the evidence would

19   demonstrate that something took place here.  So that's one of

20   the requirements or one of the other things that would need to

21   be established.  Any questions about venue?

22             THE DEFENDANT:  No, sir, your Honor.

23             THE COURT:  All right.  So let me spend a minute just

24   reminding you what the penalties are for this crime.  This

25   crime carries a maximum term of imprisonment of ten years.  It

1    also carries a maximum term of supervised release of life, as

2    well as a mandatory minimum term of supervised release of five

3    years.  This crime also carries a maximum fine of the greatest

4    of either $250,000 or twice the gross gain derived from this

5    crime or twice the gross loss to persons other than yourself

6    that resulted from the crime.  So whichever those three

7    alternatives is the greatest that's the maximum fine that I can

8    impose.

9         In addition to a fine I can also order that you pay

10   restitution to any person or entity that was harmed as a result

11   of this crime and that's separate from a fine.  I can also

12   order you to forfeit any property other proceeds derived from

13   this crime.  The law basically provides that a person should

14   shouldn't not profit from a crime so that Court is authorized

15   to order a defendant to forfeit any proceed from the crime that

16   they or their co-conspirators made or any property used to

17   facilitate the crime and again that's separate from the fine,

18   separate from restitution.

19        And then finally there's a $100 special assessment

20   that's mandatory and has to be paid and that also is separate

21   from any fine, forfeiture for restitution.

22        Do you have any questions about those penalties?

23        THE DEFENDANT:  No, sir, your Honor.

24        THE COURT:  You should understand that as a result of

25   your plea to this offense you may be required, in fact, you

1    would be required to register as a sex offender under the Sex

2    Offender Notification Act; do you understand that?

3                    THE DEFENDANT:  Yes, sir.

4                    THE COURT:  That could be onerous but it's just

5    something that you should be aware of and have thought about

6    before you plead guilty.  So that's something you've considered

7    and discussed with your attorney?

8                    THE DEFENDANT:  Yes, sir, your Honor.

9                    THE COURT:  All right.  You should also understand as

10   a result of your guilty plea you could face the possibility of

11   civil commitment under the Adam Walsh Child Protection Safety

12   Act following the completion of any term of imprisonment.  That

13   act permits the attorney general or director of the Bureau of

14   Prisons to certify that a prisoner approaching the end of his

15   in incarceration is a sexually dangerous person.  And if at a

16   hearing before a court the government demonstrates by clear and

17   convincing evidence that the inmate is sexually dangerous, then

18   the inmate could be committed to further custody until the

19   Court determines that he is no longer sexually dangerous.

20   Again, I don't know if that would apply here but that's a

21   statute that might be relevant given the nature of the crime.

22   Do you understand that?

23                    THE DEFENDANT:  Yes, sir, your Honor.

24                    THE COURT:  OK.  Are you a citizen, Mr. Bennett?

25                    THE DEFENDANT:  Yes, sir.

1       THE COURT:  You should understand that as a result of

2   your guilty plea you could lose certain valuable rights such as

3   the right to vote, the right to serve on a jury, the right to

4   hold public office, and the right to possess a firearm.  Do you

5   understand that?

6       THE DEFENDANT:  Yes, sir, your Honor.

7       THE COURT:  Now with respect to supervised release

8   should understand that there are terms and conditions that will

9   be imposed as a part of supervised release and that if you

10  don't comply with any of those terms and conditions well then,

11  you could be returned to jail for a full term of your

12  supervised release without my credit for the time you'd already

13  served on supervised release; do you understand that?

14      THE DEFENDANT:  Yes, your Honor.

15      THE COURT:  I should also mention that there is no

16  parole in the federal system.  So whatever sentence I impose on

17  you that is the sentence that you will serve; do you understand

18  that?

19      THE DEFENDANT:  Yes, sir.

20      THE COURT:  New York state and a lot of other

21  countries have parole and that means that the judge would

22  impose a sentence but that later a parole order or some actor

23  might decide this person is ready to come home sooner.  That's

24  not part of the federal system.  So if I sentence you to five

25  years, then you will serve five years.  If I sentence to you

1    ten years, you would serve ten years.  The only exception to

2    that is you could get a certain amount of time off for good

3    behavior.  But that amount of time off would not be more than

4    15 percent of the total sentence and the decision as to whether

5    you had demonstrated good behavior would be up to the Bureau of

6    Prisons, not up to me.  Do you understand that?

7              THE DEFENDANT:  Yes, sir, your Honor.

8              THE COURT:  Are you serving any other sentence at this

9    time any place?

10             THE DEFENDANT:  No, sir.

11             THE COURT:  All right.  The decision as to what

12   sentence you will receive will be made by me and no one else.

13   So no matter what anyone else has told you I am not bound by

14   that.  I have to make my own decision and exercise my own

15   judgment in determining what is the appropriate sentence in

16   this case; do you understand that?

17             THE DEFENDANT:  Yes, sir, your Honor.

18             THE COURT:  Now there are certain factors that I am

19   required to consider.  Congress has passed a statue that

20   identifies certain factors that judges must take into account

21   in fashioning a sentence and I want to go over what those are.

22             First of all, I have consider your own personal

23   history.  You're a complicated person like everybody, so I have

24   to make sure that the sentence I impose reflects who you are.

25   It's not based solely on the crime but on the totality of the

1    person before me.  I have to tailor the sentence to you, the

2    individual.  So I am going to look at your entire life from

3    your birth to the present in all its richness and

4    complicatedness, I guess is the word I am looking for.  You

5    know, your childhood, your educational history, your work

6    history, you psychological history, your family circumstances

7    and family connections.  All those things matte and will be

8    relevant to the sentence that I impose.

9         Now I have to balance that against other factors

10   including the facts and circumstance of the crime.  This is a

11   very serious crime obviously and it's important that the

12   sentence I impose reflect the seriousness of the crime.  So I

13   need to make sure that the sentence is also tailored to the

14   circumstances of this crime, not just what it's called but what

15   happened here, what you did, what others did, what the

16   consequence were.  I have to make sure that the sentence I

17   impose amounts to just punishment and that it also promotes

18   respect for the law.

19        Another factor that's related but distinct is the need

20   to deter or discourage future criminal conduct by you and

21   others and the hope is that by imposing a sentence on you in

22   this case it will send a message to you that you can't engage

23   in conduct like this in the future and that hopefully this will

24   be the last criminal act of your life.  But also the hope is

25   that other people might learn about your sentence and be

educated by it, that they would be deterred or discouraged from

committing crimes like this in the future because they

understand and recognize the costs associated with such crime.

It's hard to know candidly what the future will hold or what

message will be received when I impose a sentence in one case.

But I think most of us recognize there is something to that and

Congress has certainly directed judges like me to consider the

possible future deterrence that would be associated with a

sentence I impose.  So I'll consider that.

        Other factors I have to consider are your own needs

while you are in custody.  To the extent you have mental health

needs or other health needs I'll make sure that those are

addressed when I impose sentence.

        Another important factor I have to consider is what's

known as the United States Sentencing Guidelines.  Have you

heard of those?

        THE DEFENDANT:  Yes, sir, I --

        THE COURT:  The Sentencing Guidelines are a big book

put out by a commission of judges and lawyers and experts in

the field and there's a new edition each other.  Sometimes

there's minor amendments.  The current version is about five or

six hundred pages long.  But the point is that this book is

designed to give guidance to judges like me.  So for every

crime or type of crime there's a chapter in this book.  And a

judge is directed to go to the chapter for the relevant crime

1    and to make certain findings of fact.  And then based on those

2    findings of fact the judge assigns points and goes through a

3    pretty rudimentary sort of process of addition and subtraction

4    to come up with a number and that number is referred to as

5    offense level.

6           The judge then goes to a different chapter in the book

7    that relates to criminal history and makes a similar analysis.

8    The judge determines whether the defendant has any prior

9    convictions and if so when.  If they're really old maybe they

10   don't count.  If there are prior convictions that result in

11   sentences the judge will consider what the nature of the

12   sentence was and the length of the sentence.  And depending on

13   the answers to those questions the judge will assign points, go

14   through another process of addition to come up with a total

15   number of points and that then leads to the judge deciding

16   which of six criminal history categories applies.  There are

17   six.  Category one is the lowest and least serious.  Category

18   six is the highest and most serious.

19          And then on the basis of those two findings the

20   offense level on the one hand, the criminal history category on

21   other, the judge then goes to the back of the book where

22   there's a grid or a table and simply kind of just goes down

23   this column here on the far left which is the offense level,

24   stops when he or she gets to the proper offense level and then

25   goes across from left to right to these other columns which are

1    the criminal history categories and the judge stops when he or

2    she gets to the appropriate criminal history category.  And

3    where the judge's finger ultimately rests well that's the range

4    within the view of the commission that prepares this book would

5    be appropriate.  So every judge is directed to go through that

6    process and to make these findings.  Now ultimately, I am not

7    bound by this book I am free to go higher or lower.  But I am

8    required to consider the book.  I am required to make findings

9    under the guidelines and I will do that.

10          And then finally I guess the last factor that I am

11   required to consider is the need to avoid unwarranted

12   sentencing disparities between the sentences of similarly

13   situated defendants.  And that's sort of a fancy way of saying

14   that before imposing sentence a judge is really asked to take a

15   step back and to make sure that the sentence being imposed is

16   roughly in line with what other judges have imposed on similar

17   defendants elsewhere, recognizing that it would undermine

18   people's confidence and undermine respect for the law if

19   defendants who were very similar and had engaged in very

20   similar crimes were getting wildly different sentences simply

21   because of who the judge was or who the lawyers were.  So

22   judges are asked to take that into account to make sure that

23   the sentences roughly line up recognizing that of course no two

24   people are exactly alike and no two crimes are exactly alike.

25   So those are the factors that I am required to consider.  Do

1    you have any questions about any of those?

2                THE DEFENDANT:  No, sir, your Honor.

3                THE COURT:  All right.  And the tough part is, of

4    course, balancing these things.  Sometimes they are

5    intentional.  So a judge's job is to consider balance, weigh

6    and ultimately reconcile these various objectives in fashioning

7    a sentence on an individual.  So that is what I will do now

8    that will take some time.  It'll take a few months before I do

9    that but that's the process, all right.

10               Now I understand there's no plea agreement in this

11   case I have received a copy of the letter that I believe the

12   government sent to you, Mr. Bennett.  It's a letter dated

13   September 4 signed by Ms. Choi, addressed to

14   Ms. Cross-Goldenberg.  It's a four-page letter.  Have you seen

15   this letter?

16               THE DEFENDANT:  Yes, sir.

17               THE COURT:  You've read it?

18               THE DEFENDANT:  Yes, sir.

19               THE COURT:  You've discussed it with

20   Ms. Cross-Goldenberg?

21               THE DEFENDANT:  Yes, sir, your Honor.

22               THE COURT:  This is not a plea agreement.  You are

23   bound by this letter.  This is really just the government

24   putting you on notice of the government's view as to how the

25   sentencing guidelines apply in this case.  There was a time

1    when these guidelines were mandatory.  You may know that from

2    your legal training.  That changed with a Supreme Court case

3    around 2004 or 2005.  But while they were mandatory there was a

4    case in this circuit called U.S. v. Pimentel in which the Court

5    said the best practice is to notify defendants of the

6    government's view of the guidelines and how they apply in the

7    case before a guilty plea.  That practice continues even now

8    that the guidelines are no longer mandatory.  And so this is to

9    put you on notice as what the government's view is, at least as

10   of today.  Things could change I suppose but this is their view

11   as of today.  So you've seen.

12          The government's view is that the offense level in

13   this case is level 33.  The government's view is the criminal

14   history category is category one.  And taken together that

15   results in a sentencing range of 135 to 168 months but the

16   maximum sentence here is 120 months.  So in the government's

17   view that would be an appropriate sentence under the

18   guidelines.  Do you understand that?

19          THE DEFENDANT:  Yes, sir, your Honor.  Can I ask

20   Ms. Cross-Goldenberg --

21          THE COURT:  Yes.

22          (Pause)

23          THE DEFENDANT:  Thank you, your Honor.  I appreciate

24   it.

25          THE COURT:  That's quite all right.  I told you

1    upfront I want you to take advantage of that if you are not

2    sure of anything.

3            This is the government's view and you are free to

4    argue that the guidelines are lower and you are free to argue

5    lots of other things at sentencing.  So this is not a

6    restriction on you at all and it's not a restriction on me

7    either.  I'll make my own findings with respect to the other

8    factors I've mention.  My question to you is has anybody

9    threatened you in order to make you plead guilty here today?

10           THE DEFENDANT:  No, sir, your Honor.

11           THE COURT:  Has anybody offered you anything of value

12   in exchange for pleading guilty here today?

13           THE DEFENDANT:  No, sir.

14           THE COURT:  Has anybody promised what your sentence

15   will be?

16           THE DEFENDANT:  No, sir, your Honor.

17           THE COURT:  Ms. Cross-Goldenberg, are you aware any of

18   defense that would prevail or any reason why Mr. Bennett should

19   not be allowed to enter a guilty plea today?

20           MS. CROSS-GOLDENBERG:  No, your Honor.

21           THE COURT:  OK.  All right.  So, Mr. Bennett, I guess

22   at this time I'll ask you to tell me in your own words what it

23   is that you did that makes you guilty of this crime.  Sometimes

24   I ask people to stand but the acoustics are terrible and

25   microphone is set, so go ahead.

1          THE DEFENDANT:  I possessed images containing child

2     pornography on my computer in my apartment in Manhattan.  I

3     know what I did was wrong and I am very sorry and remorseful

4     for my actions.

5          THE COURT:  When did this take place?

6          THE DEFENDANT:  This took place in 2012.

7          THE COURT:  2012, all right.  And you said it was, the

8     computer was in your apartment in Manhattan?

9          THE DEFENDANT:  Yes.

10          THE COURT:  The images that were contained you

11     understood them and knew them to be child pornography as that

12     term is defined?

13          THE DEFENDANT:  Yes, sir.

14          THE COURT:  You said a moment ago that you understand

15     that it was wrong and illegal for you to do that?

16          THE DEFENDANT:  Yes, sir.

17          THE COURT:  All right.  Ms. Choi, is that a

18     satisfactory allocution?  Is there anything else?

19          MS. CHOI:  Not of Mr. Bennett.  The government would

20     just note for the record that with regard to the second element

21     the interstate and foreign commerce element, there is a NIKMIK

22     analysis of the images that were found on the computer hard

23     drive found in Mr. Bennett's apartment and those victims have

24     been identified as being outside of the Southern District of

25     New York and outside of the state of New York.

1          MS. CROSS-GOLDENBERG:  I am sorry.  I couldn't

2    understand.  You trailed off.

3          THE COURT:  A little louder and a little slower.

4          MS. CHOI:  The victims that were identified in the

5    NIKMIK report -- that's the national database for the

6    identification of victims of child pornography in cases such as

7    this -- has identified certain known victims as being outside

8    of the Southern District of New York and the state of New York.

9    So as to satisfy the second element that there would be a

10   transportation of those images through interstate commerce.

11         THE COURT:  OK.  Ms. Cross-Goldenberg, any questions

12   about that?

13         MS. CROSS-GOLDENBERG:  No, your Honor.  Just to

14   clarify, I think Mr. Bennett got a little cutoff in terms of

15   the timeframe.  The timeframe in the probation which continued

16   to February 2013, just to make the record clear.

17         THE COURT:  OK.  I think it's almost any time in that

18   period is fine.  So we'll flesh all this out more in connection

19   with the sentencing but I think it's a satisfactory allocution.

20         So, Mr. Bennett, I'm going to ask Ms. Choi to

21   summarize the government's proof, what the government would

22   demonstrate if the case went to trial.  Listen to what she has

23   to say.  If when she's finished you disagree with anything that

24   she has said or you would like to clarify or qualify something

25   that she has said I'll give you an opportunity to do that or

1   you can confer with Ms. Cross-Goldenberg and she can do it for

2   you.  But listen carefully to Ms. Choi.

3          So, Ms. Choi, if the case were to go to trial what

4   would the government demonstrate?

5          MS. CHOI:  Your Honor, there would be testimonial

6   evidence both from an undercover law enforcement agent to whom

7   Mr. Bennett distributed child pornography, as well as the hard

8   drive that was recovered from Mr. Bennett's house that

9   contained the images of child pornography.  In addition, there

10  are post arrest statements that were made after being advised

11  of his rights by Mr. Bennett in which he admitted to the

12  offense conduct here.

13         THE COURT:  All right.  Mr. Bennett or

14  Ms. Cross-Goldenberg, anything you would like to --

15         THE DEFENDANT:  Sir, may I just ask her?

16         THE COURT:  Sure.

17         (Pause)

18         MS. CROSS-GOLDENBERG:  Thank you, your Honor.

19         THE COURT:  All right.  Anything you wish to say in

20  response?

21         THE DEFENDANT:  No, your Honor.

22         THE COURT:  All right.  Well, now let me ask you to

23  stand, Mr. Bennett.

24         Mr. Bennett, how do you now plead to count one of

25  information?

1              THE DEFENDANT:  I plead guilty, your Honor.

2              THE COURT:  Did you do the things you are charged with

3     doing in the information?

4              THE DEFENDANT:  Yes, your Honor.

5              THE COURT:  Are you pleading guilty because you are

6     guilty?

7              THE DEFENDANT:  Yes, your Honor, I am.

8              THE COURT:  Are you pleading guilty voluntarily and of

9     your own free will?

10             THE DEFENDANT:  Yes, your Honor, I am.

11             THE COURT:  All right.  Mr. Bennett, because you

12    acknowledge that you're guilty as charged in Count One of the

13    information, because you know your rights and you've waived

14    those rights, because your plea is entered knowingly and

15    voluntarily and is supported by an independent basis in fact

16    for each of the elements that we've discussed, I accept your

17    guilty plea and I adjudge you guilty on Count One of the

18    information.  So please have a seat.

19             What we are going to do now is set a date for

20    sentencing.  Generally, I would set a sentencing date about

21    probably three or four months out and that allows the probation

22    department to prepare a report which is very important in my

23    determining the appropriate sentence.  This report is referred

24    to as a presentence report or a PSR and it's often lengthy.  It

25    might be 30 pages long single spaced.  It has a lot of

1    information and a lot of information about you your life

2    history and many more details than what I know to date about

3    you.  It will also provide a lot more information about the

4    crime that you've pled guilty to and you've sort of covered a

5    bare minimum today.  But the presentence report will go into

6    much greater detail of what transferred.  It might also include

7    victim statements of children who were depicted.  Sometimes

8    they do anyway.

9          The way that information is gathered for the report is

10   by interviewing people principally and so among those

11   interviewed will be you.  I assume, Ms. Cross-Goldenberg, you

12   wish to be present?

13         MS. CROSS-GOLDENBERG:  Yes, your Honor.

14         THE COURT:  I'll direct that no interview should take

15   place without Ms. Cross-Goldenberg being present.  But I will

16   ask you to be truthful and complete in all your answers to the

17   probation officer.  If you were to make any false statements to

18   the probation officer, that could be a separate crime with its

19   own penalties.  It also could result in enhancements or

20   additional points on the sentencing guidelines which would

21   potentially increase your sentence.  So I don't say that to

22   scare you but just to remind you that it's really important

23   that you be truthful and accurate and complete in all your

24   answers to the probation office.

25         Now once the report is finished a draft will be sent

1    to you, so you should read it carefully.  Ms. Cross-Goldenberg

2    will do the same.  The government will get a copy as well.  If

3    there are portion of the report that you disagree with, discuss

4    that with Ms. Cross-Goldenberg.  She will then convey any

5    objections or corrections to the probation officer.  The

6    probation officer will then issue a final report and that will

7    come to me.  That will be the first one that I will see.

8    Again, read it carefully.  It may be that the objections that

9    you had before are still there.  You should then, again, he

10   reiterate them to Ms. Cross Goldenberg and if there are any

11   portions of the report that you and or she disagree with, she

12   will then make those objections to me.  Those will be formal

13   objections.  Ms. Choi will have the same opportunity.  If there

14   are objections then I will resolve the objections.  I'll either

15   have a mini trial or perhaps just have argument from the

16   lawyers.  The real issue will be what conclusions or inferences

17   should be drawn.  So I will resolve any disputes or objections

18   to the presentence report.  I guess the one exception will be

19   if there's some dispute or factor that I think is irrelevant,

20   then maybe I will just -- I don't need to decide.  But in any

21   event, read it carefully and discuss it with Ms. Cross

22   Goldenberg.

23           In addition to the presentence report I will also

24   review anything else submitted to me in connection with

25   sentencing.  I suspect, that Ms. Cross-Goldenberg will submit a

1    sentencing memorandum that explains more about you and this

2    crime and makes a recommendation as what would be an

3    appropriate sentence.  The government will have the same

4    opportunity.  I expect that they will take that opportunity.  I

5    will carefully read those, of course.

6          It is not uncommon that sometimes a defendant, himself

7    or herself and sometimes family members or friends of the

8    defendant wish to write letters to the Court prior to

9    sentencing.  That's perfectly fine.  I am happy to get letters

10   like that.  My only request is that if you or others wish to

11   write a letter like that, have the letters go to

12   Ms. Cross-Goldenberg.  She'll collect them and then attach them

13   to her submission and that way I'll get everything all at once

14   and I can be confident that I haven't missed anything.  So

15   that's the way we should do it.  But I certainly will read any

16   letters that I get.

17         Once I've done all that stuff the sentencing date is

18   January 16, 2015 at 11 a.m.  I'll ask for the defense's

19   submission by January 2 and the government submission by

20   January --

21         MS. CROSS-GOLDENBERG:  Your Honor, is there any way

22   that we could do it within the usual three month span?  I

23   understand that the Court's not available but if there is some

24   way we could do it a month earlier --

25         THE COURT:  I'm just sort of hanging off of what

1    probation asked us to do.  So today is September 5.  They

2    usually ask us to put this out, I guess a little over three

3    months out to allow them the time to do the report and to allow

4    objections to be made.  So you want to do this before

5    Christmas?

6             MS. CROSS-GOLDENBERG:  Yes, your Honor.  And actually,

7    I am expecting a baby so --

8             THE COURT:  Congratulations.

9             MS. CROSS-GOLDENBERG:  Thank you, your Honor.  Not

10   that that would ordinarily be appropriate to mention but I

11   definitely want to be here for Mr. Bennett's sentencing.  So --

12

13            THE COURT:  What is your due date?

14            MS. CROSS-GOLDENBERG:  February 6.  So the end of

15   January is going to be getting a -- so if we could do it a

16   little before the end of the year I will feel more confident

17   that I will be able to be here which I think is important given

18   the relationship that we've built.

19            THE COURT:  I agree with that.  So if we could do it

20   before the end of the year I'll be around.  So the issue for me

21   is probation.  So what's the earliest for probation?  Is it

22   three days?  Give us one second.  We'll get the date in a

23   minute but let me tell you what's going to happen at that

24   sentencing hearing.  We are going to come into court, this very

25   room.  At that point I will go over with you and the lawyers

1    everything I've received to make sure I haven't left anything

2    out.  I'll tell you this is what I received and if there is

3    something I've missed you or your lawyer should tell me.  I

4    will then go through the presentence report.  If there are

5    objections I will acknowledge the objections.  I will make my

6    findings under the sentencing guidelines and tell you what the

7    numbers are.  And then at that point I will hear from the

8    lawyers.  I will allow them to expand upon whatever they may

9    have written to me in their submissions.  And to touched on, I

10   expect that they would touch on the various factors that I've

11   mentioned before, the factors that Congress has identified as

12   relevant to sentencing.  After I've heard from the lawyers,

13   then I'll give you an opportunity to speak.  You don't have to

14   speak but you certainly have a right to speak before I impose

15   sentence.  And you would be very welcome to, so I will give

16   that opportunity.  Ever after that I will then tell you the

17   sentence that I intend to impose.  I'll explain my reasons for

18   that.  I'll then check with the lawyers to make sure that I

19   haven't done anything illegal.  Assuming it's not, then I will

20   move forward to sentencing formally.  So that's how the process

21   will work.

22            How about Friday, December 19?

23            MS. CROSS-GOLDENBERG:  The 19th, that would be

24   perfect, your Honor.

25            THE COURT:  At two p.m.  So that will be the day.  If

1   we need to change it for whatever reason Ms. Cross-Goldenberg

2   we'll let you know but we'll try to keep it to that date.  Then

3   I guess I'll want the submissions from the defense generally

4   about two weeks before sentencing, so that would be December 5,

5   I guess and then the government by the 12th.  OK.  So any

6   questions with respect to the sentencing or the process by

7   which sentencing will line up, Mr. Bennett?

8               THE DEFENDANT:  No, sir, your Honor.

9               THE COURT:  All right.  Then I guess the last issue we

10  need to deal with is the issue of bail pending sentencing.

11  I've communicated with the lawyers last night and it appears

12  that there's a dispute.  The government intends to move for

13  Mr. Bennett to be remanded pending sentencing?

14          MS. CHOI:  Yes, your Honor.  Before we do that I was

15  just wondering if I could just have a moment to put a few

16  things on the record with regard to the conversations I've had

17  with defense counsel in this case?

18              THE COURT:  Sure.

19          MS. CHOI:  One is that one of the issues that the

20  parties had discussed over the course of the negotiations was

21  whether or not Mr. Bennett was going to give notice to the bar

22  of which he is a member of the present status of his case.  And

23  it is my understanding from Ms. Cross-Goldenberg that that

24  notification happened approximately a month ago.  And other

25  issue with regard to the forfeiture the parties have discussed

1   that the, just so that Mr. Bennett's on notice, the computer

2   that was seized from his home that contains the child

3   pornography would be forfeitable property under the applicable

4   statute.

5           THE COURT:  Anything -- you don't disagree with that?

6           MS. CROSS-GOLDENBERG:  No, your Honor.  Notification,

7   Mr. Bennett has on his own initiative notified the bar of his

8   conduct on August 22 I believe and, yes, he will now or at the

9   time of sentencing consent to the forfeiture of the computer

10  that contained the child pornography.  There were several other

11  item seized and I understand he will get those back at the

12  conclusion of the case because they did not contain any

13  contraband.

14          THE COURT:  OK.  All right.  That's fine.  So let's

15  then talk about bail.  Mr. Bennett has been on bail since his

16  arrest.  As far as I know he's been in full compliance with the

17  conditions of bail with this supervision of the Pretrial

18  Services Office.  What has changed of course is the standard is

19  now a little different.  At the time of arrest it was the

20  government's burden to demonstrate in order -- the government

21  would have to demonstrate the person was in risk of flight or

22  danger to the community.  Now the burden sort of flips because

23  you've now pled guilty to the crime, the presumption is that

24  you would be remanded or detained pending sentencing unless you

25  can demonstrate by clear and convincing evidence that you were

1    not a flight risk or not a danger to the community.  So I think

2    we all agree that's the standard at this point?

3              MS. CROSS-GOLDENBERG:  Yes, your Honor.

4              THE COURT:  And I referring to Title 18 of the U.S.C.

5    Section 3143.

6              MS. CHOI:  Yes, your Honor.  Except that I think that

7    here the crime is a crime of violence, so that the standard is

8    actually different than the one that was articulated by the

9    Court.  I am happen my to explain that.

10             THE COURT:  Yeah, do.  I just heard about this last

11   night.

12             MS. CHOI:  I am sorry, your Honor.  So under

13   3143(A)(2) that statutory provision requires defendants who

14   have been found guilty of crimes of violence and are awaiting

15   imposition of a sentence to be detained until there are

16   exceptions.  Under 3156(A)(4)(C), all child pornography

17   offenses including the one the defendant just plead guilty to

18   constitute crimes of violence.  And there are exceptions under

19   3143(A)(2) which cannot be met under these circumstances

20   because defendant has pleaded guilty and the Court's accepted

21   his plea, we don't believe there is any substantial likelihood

22   that there will be a reversal of that guilty plea.  And also

23   that the government in this case won't recommend that there

24   should be no sentence of imprisonment imposed with regard to

25   Mr. Bennett.

1          So there's only one way statutorily to avoid remand

2     under these provisions which is under 3145(C) and that requires

3     both that there is, as you expressed, a clear and convincing

4     evidence standard.  But as well that the defendant has shown,

5     clearly shown that there are exception reasons that his release

6     is not appropriate in this case and we believe that the

7     exceptional reason standard cannot be met.  I don't know if you

8     would like us to start with that.

9          THE COURT:  It wasn't clear to me that the crime that

10    Mr. Bennett pled guilty to was under 3143(A)(2), so that

11    gives -- I want to just nail that down.

12         MS. CHOI:  Yes, your Honor.  That's again under

13    3156(A)(4)(C) which makes reference I believe to Chapter 110 of

14    Title 18 which includes all the child pornography offenses.

15         THE COURT:  3156(A)(4)(C) any -- chapter --

16         MS. CHOI:  Yes, your Honor.

17         THE COURT:  And this crime that Mr. Bennett just pled

18    guilty to falls under one of those chapters.

19         MS. CHOI:  Chapter 110, your Honor.

20         THE COURT:  It's always frustrating that they use

21    chapter sections that don't peg with the code that I have in

22    front of me.

23         Any dispute about that, Ms. Cross-Goldenberg?

24         MS. CROSS-GOLDENBERG:  Your Honor, we do believe there

25    exceptional circumstances.

1        THE COURT:  Any dispute that this is a crime that

2   falls under Chapter 110 and therefore is implicated under

3   3143(A)(2).

4        MS. CROSS-GOLDENBERG:  No, your Honor.

5        THE COURT:  All right.  So then the standard is

6   different than the one I announced, Mr. Bennett.  It's

7   basically, a mandatory -- it's mandatory that you be remanded.

8   The only exception is one that's been sort of judicially

9   created.  I think as much as anything else under Section 3145

10  under a heading of review and appeal of a release or detention

11  order.  The second circuit has nonetheless said the district

12  court -- I guess I would be repealing or reviewing my own

13  viewing which is metaphysical.

14       But in any event, I think the case law is clear that I

15  do have the authority to allow a person who has pled guilty to

16  be kept out on bail if there are exceptional circumstances and

17  if they can demonstrate by clear and convincing evidence that

18  they are not a risk of flight and not a danger to the

19  community.  And the exceptional circumstances that's usually a

20  pretty tall mountain to climb.  It includes things like if a

21  person is a cooperator and is engaged in active investigations

22  for the government or it includes things like where someone is

23  physically debilitated or they have family circumstances where

24  they're sole caretaker of an infant or disabled adult or

25  something like that.  So I think I am anxious to hear what

1  exceptional circumstances would apply here but sort of being in

2  compliance with supervised release -- excuse me -- being in

3  compliance with pretrial supervision or the bail conditions or

4  being just sort of actively employed and productively and

5  gainfully employed is not usually going to be enough.

6         So, Ms. Cross-Goldenberg, I guess it's your burden in

7  spades, so go ahead and tell me the exceptional circumstances.

8  I think the time being I am prepared to except that he's not a

9  risk of flight.  I've not heard anything other than nature of

10  the crime to conclude that there's any reason to think there's

11  dangerous opinions here.  Mr. Bennett has been in full

12  compliance as far as I know with all the conditions of his

13  bail.  At least that's what Pretrial Services told me.

14         MS. CROSS-GOLDENBERG:  Well, your Honor, let me just

15  start with the clear and convincing part, the risk of flight

16  and dangerousness.

17         THE COURT:  Well, can I interrupt there?

18         Ms. Choi, are you contesting?

19         MS. CROSS-GOLDENBERG:  Let me say one thing, your

20  Honor.  Before that way back in October when Mr. Bennett was

21  first released there was a, he did make an internet posting

22  from a cellphone.  That was discussed with Pretrial.  He

23  doesn't have the phone any more and there have been no issues

24  at all related to anything like that since then.  In November

25  he did take a trip, a work trip to California.  He was a

1   speaker at a conference.  And Judge Ellis approved that travel.

2   He had a third party custodian with him the whole time.  He was

3   prohibited from leaving hotel where the conference was.

4   Pretrial had given him a curfew of nine p.m. to be back in his

5   hotel.  But the keynote dinner ran over, so he was a half hour

6   late getting back to the hotel room.  And while they were

7   attending the keynote speech Mr. Bennett and his aunt actually

8   who was the third party had their cellphone ringers off.  So

9   view either of those as a material issue with respect to the

10  conditions of the bail.  That happened in October or very

11  beginning of November.  So for the past ten months my

12  understanding also from pretrial is that he has been fully

13  compliant but I want to make sure that is clear so I am not

14  misrepresenting.

15       THE COURT:  OK.  Tell me about the exceptional

16  circumstances.

17       MS. CROSS-GOLDENBERG:  OK.  Well, your Honor, I think

18  that a lot of what goes into establishing what clear and

19  convincing evidence that Mr. Bennett is not a danger, not a

20  light risk in this case do rise to the level of exceptional

21  circumstances.  As the Court may recall from our last

22  conference in this case, the search that was affected on

23  Mr. Bennett's apartment and that led to the discovery of the

24  child pornography was affected in February of 2013.  He was not

25  arrested for eight months after that search.  And in those

eight months just the act of the search in the presence of a

law enforcement in the apartment and understanding of that it

was wrong to be doing what he was doing, in those eight months

there were no issues with him viewing child pornography.  He

posed no danger during that time and that was before his

arrest.

          Your Honor, he is employed as the Court may recall.

He is actually teaching down the block at the BMCC.  He is

teaching courses on corrections and criminal justice.  And

actually he just started the semester last week and so I do

think even if the Court doesn't view full-time employment or

regular employment as an exceptional circumstance, I think the

fact the semester just began last week and that not only would

he be leaving his students and school completely high and dry

but a remand today would completely obliterate any chance of a

career that he has following this case which already has -- as

I said he's notified the bar.  He will likely at least be

suspended from the practice of law but at least he can continue

with his second career which is teaching.

          THE COURT:  But the timing was somewhat under

Mr. Bennett's control and at least there was a strong

likelihood of remand that should have been considered before

starting a semester.  So I am not sure what to make of that.

To not plead guilty until a week into the semester and say it's

a reason not to remand me sort of looks a little manipulative.

1        MS. CROSS-GOLDENBERG:  Well, your Honor, I can assure

2    you that it's not.  As the Court recalls from our last

3    conference there have been negotiations ongoing for many months

4    and to the extent there were delays in the process they were

5    all completely beyond Mr. Bennett j's control whether we could

6    obtain medical record and things like that were beyond our

7    control.

8        With respect to dangerousness, your Honor, I don't

9    know if the Court wants to see this but we've heard with the

10    government previously as part of the negotiations in this case,

11    we have had Mr. Bennett evaluated.  And his the evaluation

12    couldn't be clearer that he doesn't pose a danger.  The

13    conclusion is that he is not a pedophile.  He is not dangerous,

14    that there was no escalation in his conduct that would suggest

15    a risk of a contact offense.

16        As we discussed little bit with your Honor at the

17    beginning of this session, he was battling depression.  There

18    were other things going on in his life around the time of the

19    search that contributed to that depression.  As of this time he

20    is not diagnosed with any mental illness but he has benefited

21    from the treatment that he has been undergoing as a result of

22    his Pretrial supervision.  The reports from the provider that

23    he's been seeing at the request of Pretrial show that he's been

24    very engaged and very responsive to treatment in Pretrial, that

25    he has demonstrated genuine rehabilitation and that he would

47

E95AABENPPlea

1  benefit from continued meaningful treatment.  The report

2  concludes that he is an excellent candidate for supervision,

3  not incarceration and for treatment and rehabilitation.

4  And I think that there is actually a couple important

5  points in there.  One is with respect to the whether he

6  actually poses a danger.  And I think the report clearly and

7  convincing states that he does not.  But it also considered the

8  fact that the treatment that he's been undergoing since he was

9  arrested in October has been productive and successful and he's

10  been very engaged in it.  And the abrupt stop to that treatment

11  if the Court were to remand Mr. Bennett now he would not

12  receive any treatment for the foreseeable treatment.  There is

13  absolutely nothing at the MCC.  There is absolutely nothing at

14  the MDC.  He would just be sitting there and that just seems

15  counterproductive to the entire philosophy of all of the goals

16  of sentencing that the Court just went over and to any sort of

17  rehabilitation that we might hope to get out of this process.

18  Your Honor, I think another exceptional thing about

19  Mr. Bennett is that from the beginning, meaning before he had

20  an attorney, before he was arrested, after the search he

21  expressed remorse for his conduct in communications with the

22  Department of Homeland Security over the items that were

23  seized.  And again, he never contested the seizure or the

24  forfeiture of his computer which had the images on it but he

25  did request the return of his properly that didn't contain any

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    contraband.  And even without an attorney he was forthcoming

2    and remorseful and it wasn't to the extent of pleading guilty.

3    He wasn't in that situation.  He wasn't charged with a crime

4    but he did explain to them how devastating the impact of this

5    search and the effect of it will be made on him and the steps

6    that he was taking to turn his life around and as I said for

7    those eight months he wasn't even arrested.  So it is very hard

8    for me to understand how someone can be left out on the street

9    for eight months without any pursuit of any charges against him

10   and then all of a sudden he becomes this, that there's just no,

11   absolutely no way to meet this burden that we have here.

12          And so I think, your Honor, I have two other points

13   that what I want to give -- and I apologize for not doing this

14   at the beginning -- but I want to introduce the Court to Jordan

15   Powell who is in the second row.  He is Mr. Bennett's good

16   friend.  He actually just started law school last month.  I

17   guess he's in his first year.  And he was present at

18   Mr. Bennett's -- I guess at the arrest actually -- and then

19   came with him to court on the day of his presentment and agreed

20   to serve as a third party custodian.  So on the day that

21   Mr. Bennett was released while he, until I guess the electronic

22   monitoring and everything else was in place and Mr. Powell is

23   more than willing to continue in that role, to report to the

24   Court if the Court so desires and to do what the Court feels is

25   necessary, to continue to make sure that Mr. Bennett complies

1    his with his bail continues as he has been doing for the past

2    ten months.  And I think that's exceptional, your Honor, and I

3    think that the fact that a friend would stand up and say I have

4    that much confidence in you.  And Mr. Powell's been in touch

5    throughout the case.  He actually submitted to us a letter, a

6    character letter regarding Mr. Bennett to submit to the

7    prosecutor's office and the exceptional support that he's shown

8    to Mr. Bennett is exceptional in this case as well.

9            Your Honor, as I mentioned in my e-mail last night the

10   government told me on Wednesday evening that it was planning to

11   seek remand.  I have a list of about 20 cases in this district

12   and several more in the Eastern District where in cases of this

13   nature individuals were left out on bail pending either

14   sentencing or sometimes after sentencing pending a voluntary

15   surrender.  I think in considering exceptional circumstances,

16   not just in this kind of case but in all kinds of cases there's

17   always the question of whether there's a chance that the person

18   may not be sentenced to jail at all.  And that certainly a

19   possibility in this case.  There's no mandatory jail sentence

20   here and there are many cases in this district where judges

21   have imposed sentences of probation or time-served in these

22   cases.  There has been as the Court knows, even the Second

23   Circuit was highly critical in the guidelines in these sorts of

24   cases.  So that's one thing.  And that's the same analysis

25   going to a drug case or another case that falls into that

1    category where individuals are left out on bail.

2           But, your Honor, just with respect to child

3    pornography cases even in this district, even where judges do

4    impose sentences of jail, Judge Castel, Judge Forrest, Judge

5    Gardephe, Judge Batts, Judge Marrero, even your Honor have left

6    out individuals, left them out on bail pending either

7    sentencing or the service of their sentence.

8           I had a case in front of Judge Kaplan a few years ago

9    where he sentenced the defendant to 24 months in jail and he

10   still gave him two months to voluntarily surrender and that

11   case contained facts that were much worse than the facts in

12   this case that contain actual attempts to solicit a meeting

13   with the child, actual conversation regarding actual contact

14   with children, things that pose much more risk and danger.

15   There's nothing like that in this case.  And in fact it's the

16   opposite in this case when Mr. Bennett has offered such things

17   or others -- possibly the undercover in this case, I don't

18   know -- offered to arrange such meetings and Mr. Bennett

19   rejected it.

20          And so, your Honor, I can hand the Court a list.  I

21   can hand the Court the evaluation that I think is as I said

22   clearly and convincingly shows that he is not a danger but it

23   also rises to the level of seconds exceptional circumstances

24   because in these sorts of cases it is rare to have a situation

25   where you have no attempts to arrange meetings with children,

E95AABENP                    Plea

no conversations regarding even fantasizing about arranging

meetings with children and then when you have test results that

demonstrate that the individual is not dangerous and really

continued treatment of the kind that is already undergoing is

the best solution.  And so I think all of that is exceptional,

your Honor.  And for all of those reasons we think that bail

should be continued.

          THE COURT:  All right.  Ms. Choi.

          MS. CHOI:  Yes, your Honor.  I think that taking what

Ms. Cross-Goldenberg has said at face value those constitute

arguments that go to the first prong which is the clear and

convincing evidence of danger of risk of flight.  I don't think

any of them rise to what the Second Circuit has articulated is

standard for exceptional reasons to allow for the exception to

the mandatory rule.

          She speaks of his employment history, his present

employment and other individuals who would support him, but as

the Second Circuit has articulated they've expressly rejected

arguments such as going to school, being employed or being a

first time offender as to United States v. Scalia 360 F.3d 401,

a 2004 Second Circuit case.  Courts generally do find exception

under certain circumstances but usually comes up as your Honor

knows when there is unique family or personal circumstances in

combination with some likelihood that the conviction was in

error or could later be challenged.  Don't see those here.

1   This is an individual who lives by himself.

2   Ms. Cross-Goldenberg doesn't make reference to any dependents

3   for whom there would have been to be some sort of provisions

4   made to deal with the incarceration.  And I don't think that

5   there's any viable challenge to the that has just been accepted

6   by the Court.

7           In addition, I think Mr.  Cross-Goldenberg does a good

8   job of articulating the 3553(A) factors.  But they do, I think

9   the Second Circuit case law and other courts in this district

10  has made clear that these are not arguments that rise to high

11  standards as your Honor has articulated.  I think the Pimentel

12  letter and the enhancements under the guidelines show the

13  seriousness of the offense in this particular circumstance.

14  Congress has made its determination that it is a crime of

15  violence.  This is not a case where I think offense conduct

16  should be minimized and the reason the government will seek an

17  incarceratory sentence is because the nature of the videos in

18  this particular case was egregious.  There were young victims.

19  There is pain and violence depicted in some of these images.

20  The defendant didn't just possess them but he distributed them

21  to other individuals.

22          And for all those reasons a substantial incarceratory

23  sentence would be appropriate here.

24          There is two other points I just want to briefly raise

25  with regard to the no treatment argument.  I don't know what

1   Ms. Cross-Goldenberg's basis for that assertion is.  I know

2   that there are psychological treatment options available at the

3   MCC.  At least that's my impression from other cases.  And I

4   think the rest of the argument that's she's made about the

5   support just simply are things that the Court should take under

6   advisement at sentencing but they do not raise exceptional

7   circumstances under applicable Second Circuit case law, your

8   Honor.

9           THE COURT:  All right.

10          MS. CROSS-GOLDENBERG:  One moment, your Honor?

11          (Pause)

12          MS. CROSS-GOLDENBERG:  Your Honor, as I said, I have a

13  list of cases here.  I can run through them if the Court wants.

14  I know there is at least one case in the Eastern District right

15  now, U.S. against Lee, where Judge Gleason made the finding

16  that because the defendant was in treatment and was making

17  progress that that counted as exceptional circumstance in that

18  case in order to leave him out following his plea and before

19  the court's sentencing.  And in that case the defendant pled to

20  a count carrying a five year mandatory minimum.  So in that

21  case there was going to be definitely five years in jail.  And

22  Judge Gleason recognizes where the defendant is making progress

23  in treatment which is the goal, the ultimate goal of this whole

24  thing is that this conduct never happened again that that is

25  the kind of exceptional circumstance a court can take into

1    account.

2            And, your Honor, it's true Mr. Bennett lives alone.

3    Many arrangements would have to be made if he was remanded

4    today.  He does own his apartment.  I mean, in addition to

5    getting all of his personal affairs in order he does have a cat

6    which is at the apartment right now.  His mother actually has

7    left or is leaving.  She's not on an airplane right now on her

8    way do a medical mission in South Africa with a church ministry

9    that she works with.  She is a nurse and she does it from time

10   to time but she just is leaving today to go to South Africa.

11   So we wouldn't have her to rely on in terms of helping to take

12   care of his things.

13           And the reality is, your Honor, the report which,

14   again, I am happy to hand up, I am not quite sure why the

15   government's is taking at face value because they have had the

16   report for over a month but it clearly concludes that

17   Mr. Bennett is not a danger.  And I do think that in a case

18   like this the conclusion that there's nothing in either the

19   case conduct, the content of the videos, the conduct that led

20   to the arrest any of that that would suggest any kind of

21   escalating behavior that would pose a risk of any danger to a

22   child.  So I think all of those are exceptional reasons, your

23   Honor.

24           THE COURT:  I think Mr. Powell wanted to say

25   something.  Maybe you should confer with him for a minute.

1          MS. CROSS-GOLDENBERG:  Sure.  Thank you, your Honor.

2          (Pause)

3          MR. POWELL:  Hello, your Honor.

4          I just wanted to speak on behalf of Mr. Bennett.  I

5    think it's pretty clear that he is not a flight risk or danger

6    to the community but you do have something before you that you

7    have to prove that exceptional circumstances.  And I think what

8    she mentioned is kind ever what I wanted to mention earlier is

9    Darrell about a year ago, maybe a little less than that,

10   Darrell adopted this one month old cat named Button, really

11   cute cat, takes great care of him, feeds him clips his nails,

12   does all that great stuff.  I personally couldn't take care of

13   him.  I am on campus at Fordham.  I don't know anybody that

14   would be able to take care of him and I think that represents

15   an extenuating circumstances and maybe give you some discretion

16   to kind of lean towards that.

17         THE COURT:  OK.  Thanks, Mr. Powell, and good luck to

18   you in your legal studies.

19         I guess the new fact that's come up since your last

20   spoke, Ms. Choi, is the cat.

21         MS. CHOI:  Your Honor, I would presume that Mr. Powell

22   could help Mr. Bennett make arrangements for that particular

23   cat even if he could not himself make the arrangements.  As

24   your Honor noted, the defendant's been placed on notice of the

25   potential for his incarceration since at least the time of his

1    being charged in October of last year, if not previous to that.

2    And in Lia itself there was a situation in which there were

3    several children which the defendant took care of that one of

4    whom had a medical condition I believe and the Second Circuit

5    rejected that argument saying that you should have made

6    arrangements ahead of time and that's not sufficient for

7    purposes of meeting the standard.

8              THE COURT:  All right.  Let me --

9              MS. CROSS-GOLDENBERG:  One second, your Honor?

10             (Pause)

11             MS. CROSS-GOLDENBERG:  Just on that last point, your

12   Honor, I just want to be clear.  Even though the government had

13   proposed a possible plea agreement several months ago I believe

14   the beginning of June, possibly the end of May, the first time

15   we heard that the government's seeking remand in this case was

16   Wednesday evening.  So to be clear, and as I said, I've

17   personally had many cases where this hasn't even been an issue,

18   people in my office have had cases where this hasn't been an

19   issue.  The Court itself has permitted at least one individual

20   I know of to remain out following a plea.

21             THE COURT:  Who are you referring to?

22             MS. CROSS-GOLDENBERG:  Your Honor, U.S. against Gin

23   which was 09 --

24             THE COURT:  I know the case.

25             MS. CROSS-GOLDENBERG:  But as I said --

1      THE COURT:  I think that was case imposed no jail time

2  at lease initially.

3      MS. CROSS-GOLDENBERG:  Exactly, your Honor, which is a

4  possibility in this case.  I mean as I said, Judges Jones,

5  Griesa, your Honor, Batts, Marrero, I believe many judges in

6  this district have imposed non incarceratory sentences in cases

7  like this.  And even in cases where the incarceration is

8  mandatory judges have permitted people to remain out following

9  their plea.  So there absolutely is no reason why Mr. Bennett

10  all along should have anticipated that this was a done deal,

11  especially since the government hadn't indicated it was going

12  to pursue this until Wednesday evening.

13      THE COURT:  OK.  Well, this first hit my radar screen

14  last night at 8:30 when I inquired as to whether there would be

15  any seeking a remand or altering bail condition.  Shame on me

16  for not figuring out that this was a 3143(A)(2) case.  I hadn't

17  realized that so I thought I'd be applying the standard with

18  respect to the fair and convincing evidence as to risk of

19  flight, dangerousness and if there were the standard I think I

20  would be continuing bail.  Because we're under a different

21  statute and because it's a statute that's mandatory remand

22  unless there are exceptional circumstances that alters the

23  analysis certainly, it seems to me that the main argument put

24  forward for exception circumstances are really the fact that

25  Mr. Bennett is engaged in productive outpatient treatment, that

1    he is teaching and that he's just begun a semester and that he

2    has a cat.  I don't dismiss any of those.  I don't think that

3    those are trivial.  I don't think they're minor.  I don't think

4    however that they individually or collectively rise to the

5    level of the kind of exceptional circumstances that are

6    contemplated under the statutes here.

7         I think the rest of argument made by Ms. Cross

8    Goldenberg are really arguments against the statute and

9    arguments for the maybe a different approach in cases like this

10   one and in cases involving treatment.  But I don't think that

11   they really advance exceptional circumstances in this case that

12   would justify overriding what is the clear directive to

13   Congress that crimes like this one require remand.  So I have

14   to call these the way I see them.

15        Mr. Bennett, it's sort of like an umpire in a ball

16   game, you know this is what Congress has said.  This is the

17   standard and I don't think that these things rise to the level

18   of exceptional circumstances that would justify thwarting the

19   will of Congress that there be an automatic remand.

20        So I will respectfully deny the motion by

21   Ms. Cross-Goldenberg on your behalf and I'll remand you.  And

22   you'll get credit for the time you served between now and

23   sentencing but I am afraid that the statute is clear and I

24   don't think the exceptions that have been offered are

25   sufficient to justify keeping you out.

1        MS. CROSS-GOLDENBERG:  One second, your Honor?

2        THE COURT:  Yes.

3        (Pause)

4        MS. CROSS-GOLDENBERG:  Your Honor, Mr. Bennett would

5   like to address the Court.  But I do just, I want to make clear

6   that those were not the only exceptional circumstances and I do

7   think that Dr. Barday's report which I have --

8        THE COURT:  I mentioned the report.

9        MS. CROSS-GOLDENBERG:  -- is exceptional.  And to the

10  extent that this is the Court's view, I would ask that the

11  Court stay the decision today, take a copy of the report so

12  that it has a chance to review it and that we come back next

13  week so that the Court could have all the facts because I do

14  think the conclusions are exceptional.

15       THE COURT:  But staying the decision, I think the

16  default for staying the decision is remand.  The statute orders

17  remand.  The defendant's burden to articulate exceptional

18  circumstances that would justify not remanding him.  So if you

19  want me to revisit this later or make additional arguments or

20  submissions later then that's fine but I don't think that the

21  result would be that I put this off for a couple weeks to

22  consider that.

23       Mr. Bennett.

24       THE DEFENDANT:  Can I just address you?

25       THE COURT:  Certainly.

1     THE DEFENDANT:  I would like to ask you if possibly I

2   can get even two days.  I know that there's a huge possibility

3   of me being incarcerated for this.  I've known that all along.

4   But I did not know at the time of my plea that I would be

5   immediately remanded or even if there was a possibility.  I did

6   not learn this until Wednesday.  I would not have taken on the

7   position that I have now teaching this semester.  I would have

8   moved things.  I would have gotten rid of my animal.  I would

9   have talked to my mother about it.  Everything is just there.

10  Even if I was given 24 hours to make it right at the school,

11  let them know I am leaving, to call movers to move things out

12  of the apartment, but I really did not prepare for this in any

13  way or else I promise you, your Honor, I would have come here

14  with given the guilty plea, having done the things that were

15  necessary to not put people in -- I mean, I rent my apartment.

16  I don't know who would go in.  And I suppose Jordan can help me

17  but I mean everything's just there.  It's nothing.  I've done

18  absolute nothing.  And I understand that I should have done due

19  diligence.  I didn't know there was a possibility, your Honor.

20  I promise I would done the things that needed to be done.  So I

21  am asking if even that you give me 24 hours or 48 hours and

22  just and I promise that I will be at whatever facility you

23  order me to go to.

24       THE COURT:  Well, look.  Again, I am sympathetic.  I

25  am dealing with a statute and cases that I think are pretty

clear about what the standard is.  And so people obviously need

to get their affairs in order and there's always loose ends

that need to be tied up but it's not clear to me that's not

going to be true in most cases or create incentive for people

to not get their affairs in order to till after the argument.

So I think there's danger to my doing that.  And I am not sure

what can't be done by the telephone now.  You obviously need to

get assistance to help wrap up the affairs.

THE DEFENDANT:  It wouldn't take longer than 24 hours

to have the movers get all the things out of my apartment but

everything is there.  I would have to find ways to pay bills.

All of those things, I could find ways to do within hours.  And

I know it was probably -- but I just want to say I really

don't -- I feel bad for my students that I won't be able to at

least say something to the school or make it right.  I mean --

THE COURT:  But what -- I -- OK.  What would 48 hours

get you on that score?

THE DEFENDANT:  Immediately leaving here I would go to

BMCC and let them know that I have to resign effective

immediately.  I would then call movers and I would have movers

come to my house immediately to move everything.  I would take

my kitten to the ASPCA and I would do all of that within 24

hours.  But I just don't want to leave.

THE COURT:  But some of those things can be done by

phone.

1        THE DEFENDANT:  Well, I have no family here.  Jordan

2    is the closest person I have here.  He is in law school and I

3    just don't want to be a burden to everybody.  It's not like I

4    have family here where I can call up and say here's my key.

5    Take care of this and that.  I would assume that people would

6    just go in and evict me at some point because I am not paying.

7    Within 24 hours I could get a lot done and I will be here.  I,

8    obviously, I would not go anywhere.  I would be where ever you

9    would report for me to be.  But I just don't know what would

10   happen to all of the things and put somebody people in a bind.

11       MS. CROSS-GOLDENBERG:  Your Honor, it would be some

12   time before he has phone access at either of the jails and

13   certainly it would be days if not weeks before any visitors are

14   allowed to see him because there is a process that involves

15   mailing a form and mailing it back and approval.  So it's just

16   not the fact that he would be able to do it right away.  And I

17   think if the Court stayed, it's not comfortable staying the

18   remand decision, I understand the Court's position in terms of

19   a fallback but the remand position only kicks in following a

20   finding of guilt.  So if the Court were to stay its original

21   finding to not take effect until next week --

22       THE COURT:  Look.  I've already accepted the plea and

23   so if this was going to be a deal breaker for the plea then I

24   guess we should have dealt with this first.  So I don't think I

25   can take a back.  I know some judges do that and it seems to me

 1    a lot of that is just sort of fixing to get around an

 2    unpleasant duty imposed by a congressional statute and I don't

 3    think judges get to do that.  What rises to the level of

 4    exceptional circumstances?  And so is it exceptional that

 5    somebody's betting treatment?  It's not that exceptional.  It's

 6    admirable.  It's good.  I agree with what Ms. Cross-Goldenberg

 7    says.  This is the goal in many ways of punishment is to make

 8    sure that a person is in a position where they don't reoffend

 9    and where they are coming out stronger than what they went in

10    as.  But I don't know that it's exceptional.  At least of the

11    facts that have been conveyed to me here today.  The fact that

12    somebody has a job, a teaching job it means there are other

13    people who depend on you but most jobs involve people who

14    depend on you.  The timing is unfortunate.  The fact that

15    there's a cat, the fact that there's things to be done before

16    one goes into custody is exceptional and that's fairly

17    ordinary.  I guess in some ways what is unusual -- I don't know

18    if it's exceptional -- it didn't dawn on anybody until a day

19    and a half ago.  Again, the only reason I asked last night

20    about an e-mail at 8:30 was -- so I am not sure why this is

21    such a late breaking set of considerations but these are not

22    considerations that every defendant doesn't have to deal with

23    when they are facing a prospect of perhaps going in.

24         Ms. Choi, what am I supposed to do about a cat and

25    movers and apartments and all that sort of thing?

1          MS. CHOI:  Your Honor, to be clear, perhaps, we should

2     have given prior notice.  I presume that the facts are pretty

3     state forward in talking to my chief but you should make sure

4     that defense counsel is aware if it which is why the notice

5     came on Wednesday.  Your Honor, again, I don't think that these

6     circumstances are any different for any other defendant that is

7     convicted of a crime of violence.  The statute is clear that

8     remand is default statutory requirement.  I don't think that

9     getting your affairs in order rises to the level as articulated

10    by Second Circuit as what constitutes an exceptional reason for

11    him to not fall within the auspices of every other defendant

12    should be treated against this particular standard and Congress

13    has made that determination as such.  I don't know what else

14    there is to say about it.

15         MS. CROSS-GOLDENBERG:  It's not the fact that

16    Mr. Bennett is in or receiving treatment that I think makes it

17    exceptional.  That's an automatic requirement of everyone on

18    Pretrial supervision or charged.  That is not what makes him

19    exceptional.  What makes him exceptional is his engagement in

20    treatment, his responsiveness to that treatment and the genuine

21    rehabilitation that the Pretrial provider has indicated that he

22    has been making.  And so I do think that's exceptional because

23    many people as they go through this process have no interest in

24    engaging with their treatment provider, especially one that's

25    court ordered.  They have no interest in making any progress or

1    in delving in issues that may have led to their arrest or their

2    conduct in the case and that's not Mr. Bennett and I think

3    that's exceptional.  And I think that in light of his, even the

4    eight months that he was out that he was unpursued by

5    authorities the eight months after his search where he

6    demonstrated that he even without any supervision or

7    requirements was not a danger to the community and continued to

8    live --

9             THE COURT:  I am not worried about the danger to the

10   community or risk of flight.

11            MS. CROSS-GOLDENBERG:  But that's an exceptional fact.

12   He had eight months when he wasn't even charged with a crime

13   and he didn't return to viewing these sort of images.  That's

14   exceptional.

15            THE COURT:  I don't know that I am prepared to agree

16   to that.  I am going to take a break for a minute to think

17   about this and also I what also want to confer with the

18   marshal.  So if you could just sit tight for about five

19   minutes, OK.

20            (Recess)

21            THE COURT:  I thought about this further.  I also

22   spoke to the marshal.  I stand by my decision respectfully and

23   reluctantly I understand that this has real implications for

24   life.  I will allow this.  I will allow Mr. Bennett to make

25   some phone calls.  You can use the phone in the robbing room

 1  with the marshal, will allow him before he goes to the cell

 2  block to make calls to sort of call the Borough of Manhattan

 3  Community College and others to make some arrangements.  I

 4  think things like moving and apartments, that stuff doesn't

 5  does need to be resolved I would think today.

 6          The situation of your employer and students is

 7  something that should be resolved sooner rather than later.

 8          The cat I think that is something that is going to be

 9  require somebody like Mr. Powell to at least step up and take

10  the cat to the ASPCA or someone else who can take care of the

11  cat.  That's something that will have to be done but with the

12  assistance of friends, I don't think -- I am not going to delay

13  remand for purposes of the cat.  But you can make arrangements

14  with Mr. Powell.

15          So, I'm sorry, Mr. Bennett.  I know you are

16  disappointed.  I think that's the reality of the statutes here

17  and that's the way I perceive my job.  That is the call that is

18  appropriate under the circumstances, OK.

19          THE DEFENDANT:  Thank you.

20          THE COURT:  All right.  So let's do that.  So the

21  marshal's here.  If you want to give your keys and things to

22  Mr. Powell.  That will enable him to get easy access to your

23  apartment, you can do that.  And then you can use my robing

24  room where there's a phone.  We can help you get that done and

25  you can go downstairs.

E95AABENP                    Plea

1           All right.  Thank you very much.

2           Mr. Powell, thank you for your being here today for

3    your remarks and helping out.  I know it means a deal to

4    Mr. Bennett.

5           (Adjourned)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25