```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          14 Cr. 203 (RJS)

5    DARRELL BENNETT,

6                   Defendant.

7    ------------------------------x

8                                         New York, N.Y.
                                          December 9, 2016
9                                         4:10 p.m.

10
     Before:
11
                     HON. RICHARD J. SULLIVAN,
12
                                          District Judge
13

14                        APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     EUN YOUNG CHOI
17        Assistant United States Attorney

18   FEDERAL DEFENDERS OF NEW YORK
          Attorneys for Defendant
19   PEGGY CROSS-GOLDENBERG
     COLLEEN CASSIDY
20

21

22

23

24

25
```

1                (Case called)

2                THE COURT:  Let me take appearances for the

3     government.

4                MS. CHOI:  Good afternoon, your Honor, Eun Young Choi

5     on behalf of the government.

6                THE COURT:  Ms. Choi, good afternoon to you.

7                MS. CROSS-GOLDBENBERG:  Federal Defenders of New York

8     by Peggy Cross-Goldenberg and Colleen Cassidy for Mr. Bennett.

9                THE COURT:  Good afternoon to each of you.  Good

10    afternoon, Mr. Bennett.

11               THE DEFENDANT:  Good afternoon.

12               THE COURT:  We have some friends and family members.

13    Thank you for being here.  Welcome.  Some of you were here

14    almost two years ago when we did the sentencing then.  Thank

15    you for coming back.  I know at least several of you have

16    written letters to the Court and I thank you for taking the

17    time to do that.  They are helpful.

18               We are here for a resentencing.  On October 31, the

19    Second Circuit issued a mandate in connection with the

20    sentencing in this case.  Although the circuit affirmed my

21    ruling with respect to the enhancement under the guidelines,

22    they remanded for resentencing in connection with a procedural

23    error related to -- I could only call it a failure to

24    explicitly refer to Section 5G1.1(a) of the guidelines.

25               To the extent there was any ambiguity, as I said in an

1    order that I issued on November 2, it seemed to me pretty clear

2    that I understood what the guidelines ramifications were where

3    the guidelines are higher than the statutory maximum.   I

4    certainly had reference materials that I had read that

5    explicitly referred to that section.   But, in any event, the

6    Court of Appeals thought it was not clear, so they remanded for

7    a resentencing.   That's why we are here today.

8            I want to go over with everyone what I have reviewed

9    in connection with sentencing.   If I have left anything out,

10   let me know.   I have reviewed everything that was submitted

11   prior to sentencing last time.   I rereviewed everything, every

12   word.   I've also reviewed the transcript of the sentencing

13   proceeding that took place on December 19, 2014.   I've also

14   reviewed, of course, the Second Circuit's opinion, which was

15   issued in October.   I have rereviewed the order that I just

16   referred to, though it's a short order, from November 2.   I

17   reviewed a letter from the government, dated November 21.   It's

18   sort of a housekeeping letter, more than anything else, about

19   scheduling.   I reviewed the December 2 submission of

20   Ms. Cross-Goldenberg.   That submission is six pages,

21   single-spaced.   It has a number of attachments, including

22   letters that I have read and reports that I have read.   So I

23   thank those again who took the time to write.   Mr. Bennett

24   wrote a letter that I also appreciated reading.   Thank you.   I

25   reviewed the government's December 5 sentencing letter, which

1   is three pages single-spaced.

2          That is what I think I have received in connection

3   with sentencing that I already did not consider the first time

4   around.  Is there anything I have overlooked perhaps?

5          MS. CHOI:  Not from the government, your Honor.

6          MS. CROSS-GOLDBENBERG:  No, your Honor.

7          THE COURT:  I don't think there is really a need to

8   repeat most of what took place back in 2014.  The guidelines,

9   I've already made the calculation.  I should state explicitly

10   for the record, in case there is any confusion, that by virtue

11   of the fact that the guidelines range exceeds the statutory

12   maximum of 10 years, then the guidelines range is 10 years,

13   pursuant to Section 5G1.1(a) of the guidelines.  That being the

14   case, the guidelines range is not more than that.

15          However, as the Court of Appeals said, the Court is

16   free to consider the fact of a charge bargain or the fact that

17   the government decided to forego potentially more serious

18   charges that are carrying with them a mandatory minimum.  They

19   carried a higher statutory maximum and it would have therefore

20   resulted in the guidelines of 11 to 13 years being relevant.

21   Again, I thought that was really the point of most of the

22   exchange on the higher range of 11 to 13.  But the guidelines

23   range here is 10 years by virtue of 5G1.1(a).  Those are the

24   guidelines.

25          Now, the other factors that the Court is required to

1  consider and considered at some length last time include the

2  individual characteristics of the defendant.  They include also

3  the facts and circumstances of this offense, the need to impose

4  a sentence that promotes respect for the law and that provides

5  a just punishment for the offense.  I have to also consider the

6  need to deter criminal conduct of this sort by the defendant

7  and by others; so, in other words, both specific and general

8  deterrence.  I also have to consider the defendant's own needs

9  while in custody.  I have to consider, of course, the need to

10  avoid unwarranted disparities between similarly situated

11  people.  I normally go over this in much greater detail and try

12  to explain what each of those things means, and I did that

13  before and I think everybody is pretty familiar with them.  I

14  won't belabor them unless people are not clear about some of

15  those things.  Then I'm happy to elaborate.  But I think you

16  get it.  I think you know what the issues are.

17          There are a lot of materials that I have received

18  recently that obviously were not before me when I initially

19  sentenced Mr. Bennett, including the letters that I have talked

20  about, including some of the reports, including the fact that

21  while in prison Mr. Bennett has taken advantage of programs

22  available to him and done well at them.  All of that is

23  relevant.  Certainly I'm not going to and would never suggest

24  that those things are not relevant.  I guess I would say that

25  most of them don't surprise me.  They are good.  They are good

1    developments and they are things that are worth being proud of

2    and they suggest growth and they suggest maturity and those are

3    all good things.

4            But I would say that these are things that I would

5    have expected and frankly did expect when I imposed the

6    sentence that I did two years ago.  In other words, I

7    recognized and spent a great amount of time really talking

8    about the many good qualities that Mr. Bennett has.  And those

9    good qualities, including his ability to be reflective, his

10   ability to be thoughtful, his intelligence, his decency, all of

11   those things I think are consistent with what has transpired

12   since.  And so I say that just to be clear that I think that

13   most of the things that I've read are not sort of game changers

14   for me.  They are things that I would have expected and things

15   that I'm gratified to see have been borne out because they

16   confirm my initial sense of Mr. Bennett and they confirm the

17   reasons why I sentenced the way I did last time.

18           With that initial reaction what we will do, as we did

19   last time, I'll hear from counsel.  I'll hear from

20   Ms. Cross-Goldenberg.

21           Ms. Cassidy, are you going to be speaking also or just

22   Ms. Cross-Goldenberg?

23           MS. CASSIDY:  Mainly Ms. Cross-Goldenberg, but feel

24   free to ask me any questions.

25           THE COURT:  I'll hear from Ms. Choi and they may have

1    a chance to respond to each other.  If they have questions of

2    each other or if I have questions based on what they say, I'll

3    certainly not be shy.  I rarely am.  And then I will ultimately

4    give you an opportunity to speak before I impose sentence,

5    Mr. Bennett, if you wish to.  You don't have to.  You have

6    written a very thoughtful letter, really beautiful letter and a

7    moving letter.  If you wanted to rest on that, that would be

8    fine.  If you wanted to say more, you have a right to do that

9    and you would be very welcome to.

10              I don't think there are any victims here, right,

11    Ms. Choi?

12              MS. CHOI:  No, there are not, your Honor.

13              THE COURT:  Victims also have a right to speak if they

14    wish to, but there are no victims here.  I assume the victims

15    were advised of this resentencing.

16              MS. CHOI:  Yes, your Honor.  If you recall, there was

17    a submission with relation to the restitution situation for

18    which your Honor last time around issued restitution in the

19    form of a thousand dollars, and we had a submission along with

20    that to your Honor back in March of 2015.  Other than that,

21    there isn't anything else in the record.

22              THE COURT:  No one else has made any submissions.

23              MS. CHOI:  Nothing new, your Honor.

24              THE COURT:  Ms. Cross-Goldenberg, I'm happy to hear

25    from you.  Again, a very characteristically thorough,

1    thoughtful, and beautifully written submission from you.

2              MS. CROSS-GOLDBENBERG:  Thank you, your Honor.

3              Before I begin I do just want to introduce the people

4    who were here for Mr. Bennett so the Court knows who is here

5    and, as always, if the Court has questions, they would be more

6    than happy to answer them.  The first is his mother, Wanda

7    Clarke.

8              THE COURT:  Yes.  I remember Ms. Clarke.  Thank you

9    for being here.

10             MS. CROSS-GOLDBENBERG:  And then his friends, Ashley

11   Shackelford and Jordan Powell, and actually on the end we have

12   Kate Hadley, a paralegal from our office.

13             All three of them were here for Mr. Bennett's initial

14   sentencing, all of them wrote to the Court in connection with

15   the initial sentencing, and all of them wrote to the Court

16   again with respect to his resentencing.  His mother traveled up

17   from Florida.  Jordan and Ashley are both in the city.

18             I think it's important because especially in a case

19   like this, where people learn things about their friends and

20   family that they didn't know, and a lot of people face total

21   abandonment by their support network.  They go off to prison,

22   especially for the lengthy term that was imposed on

23   Mr. Bennett, and everyone else sort of writes you out of their

24   life for those seven years and aren't necessarily there for

25   you.

1          And I think what's been tremendous about Mr. Bennett's

2     network is that they have walked with him through his time in

3     custody and, as you can tell from the letters, they have

4     witnessed what he's gone through, the hard work that he has

5     done and his true rehabilitation.  I'm glad they could be here

6     today and if the Court has further questions for them, they

7     would be more than happy to answer them.

8          THE COURT:  I thought the letters were beautifully

9     written.  It's rare that I see letters that are just so well

10    written, even aside from the content.  What good writers you

11    are.  But also you clearly felt deeply about what you were

12    writing.  Thank you for taking the time to do it.  I'm sure

13    there were other people who wished they could be here, but for

14    one reason or another couldn't fly in from other parts of the

15    country, but their letters are also very moving.

16         MS. CROSS-GOLDBENBERG:  Thank you, your Honor.

17         As the Court can tell from my letter, I sort of

18    planned to take the same approach that the Court just did in

19    terms of not going over everything that we discussed at length

20    during the initial sentencing.  I know that my letter in

21    connection with that was very lengthy in terms of going through

22    Mr. Bennett's childhood and the fact that his father exposed

23    him to sex and affairs and pornography and the sort of

24    pathological behavior that shaped him as a child, the impact of

25    which he really tried to ignore and sort of never processed and

1    dealt with until his arrest in this case.  He always wanted to

2    project the image of a perfect son and in that sort of tempest

3    that led to the offense conduct of professional failure, deaths

4    in the family, his mother's illness, his depression, sort of

5    all of those things coming together around the time of the

6    offense conduct.

7         I'm happy to go into that more if the Court has

8    questions about that.

9         THE COURT:  Believe me, you and I know each other for

10   a long time.  I know how thorough you are and you know how

11   thorough I am.  I have read everything again and your first

12   submission was an excellent submission.  It was really well

13   done and thorough and carefully put together.  I have not only

14   gone through that again, I've also gone through the entire

15   transcript of the last proceeding carefully and so I've heard

16   all your arguments and I know them probably as well as anybody.

17        MS. CROSS-GOLDBENBERG:  That was how I prepared for

18   today, your Honor, on that assumption.

19        What I really want to do is what I said in my December

20   2 letter.  I want to start with what's different, what's new.

21        The forensic psychologist in the BOP who treated Mr.

22   Bennett at FCC Petersburg told the Court that Mr. Bennett was

23   open to change.  He was respectful.  He had a strong desire to

24   overcome his substance dependence and had the initiative to

25   learn and succeed.  She talked about his determination to lead

1  a pro-social lifestyle, which I assume is psychologist speak

2  for the opposite of an antisocial lifestyle.

3          THE COURT:  That's what I took it to be.

4          MS. CROSS-GOLDBENBERG:  A law-abiding life free from

5  criminal activity.  And his extreme motivation to return to

6  society as a more productive citizen.

7          The treatment notes that we were able to attach to our

8  submission talk about his personal development, his self care,

9  his coping skills that he's developed.  And you have an updated

10  opinion from Dr. Barday, who although there wasn't time for him

11  to meet with Mr. Bennett in person prior to these proceedings,

12  did have a chance to review his treatment records from the BOP

13  as well as the opinions of the psychologist and the staff

14  there, and he reiterated that Mr. Bennett is not a pedophile,

15  not a sexual predator.  He is not dangerous to the community.

16  And it's evident that he lacks antisocial and psychopathic

17  tendencies, that he abounds with a desire to engage in

18  treatment, that he has proven himself to be capable and

19  committed to understanding the nature and psychological

20  underpinnings of his offense conduct.

21          THE COURT:  Mr. Bennett was sort of moving down that

22  road when I sentenced him two years ago, too.  I don't think

23  this is a change.  This is a progression on a path that was

24  already begun.  Would you agree with that?

25          MS. CROSS-GOLDBENBERG:  Your Honor, it was interesting

1    to me that the BOP evaluations both used the word change.  So I

2    think absolutely it was expected and actually the way I plan to

3    conclude my remarks is that it shouldn't surprise anyone who

4    was at the original sentencing that all those things are true.

5         But courts hear a lot of things at sentencing that

6    don't turn out to be true, and people make commitments and

7    promise judges that they are going to do things and they don't

8    follow through.  I think what is important here is this wasn't

9    Mr. Bennett going through the motions.  This wasn't him

10   complying with some sort of required programming.  This was

11   initiative that he took to get into RDAP in the first place.

12        THE COURT:  My concern was, there weren't more program

13   opportunities, that RDAP is good and there are a lot of things

14   to be said for it.  But it's not the primary problem for

15   Mr. Bennett.  But it didn't seem like there were many other

16   opportunities to get meaningful psychology services.  Is that

17   fair?  Should I be thinking about recommending a different

18   facility or something like that?

19        MS. CROSS-GOLDBENBERG:  Your Honor, really the answer

20   that we get from you is, he has made use of everything that he

21   can make use of.

22        THE COURT:  I'm surprised there hasn't been more made

23   available.  There aren't more programs available to him, I

24   guess is what I'm saying.

25        MS. CROSS-GOLDBENBERG:  I think that that really

underscores one of the reasons why it's community treatment

that is what's appropriate from here on out.  He has gotten the

treatment that he can get in the BOP.  And in terms of the sort

of internal reflection and the sort of self-care progress that

needs to be made, in terms of him getting to the root of his

conduct and understanding sort of the psychological

underpinnings and the things that he never dealt with as a

child, he has done that work over the past two years.

        And at this point what makes the most sense is allow

him to maintain that progress in the community because he is

going to be released.  And to have this chasm now of five

additional years where he sits there having completed the most

intensive treatment he can get, he is still doing the

outpatient drug program, but that's at this point more of a

maintenance as opposed to something as useful as he could get

once he is released and as he will get once he's released.

        I think that point goes to why community treatment, as

Dr. Barday recommended initially and as the BOP evaluations

seems to say, that he's been committed to and, quite frankly,

that he's ready for.  I think that's the next step.

        I think the letters from the friends and family really

underscore this point in terms of him not going through the

motions but, as his mom said, really using the time to benefit

himself as another friend, Charisse, who actually was also at

the first sentencing, said, in prison you spend every waking

1   moment trying to make up for the hurt that you have caused and

2   he will only be able to do better once he's released.

3           I think the hard work that he put into all this, it

4   demonstrates his remorse, it demonstrates his rehabilitation.

5   And as I said, I think to me it demonstrates that no further

6   time in prison is necessary.

7           I want to talk just briefly about the sort of

8   nonpersonal sentencing factors, the things that don't just go

9   to Mr. Bennett and his conduct.

10          THE COURT:  Which was really the primary focus for

11  really the sentence that was imposed.

12          MS. CROSS-GOLDBENBERG:  That's how I took it at the

13  time and that's how, in rereading the transcript, I took it.

14  And I think, you know, there is no doubt that the conduct here

15  and the videos here and the images here are shocking, they are

16  horrific.  The Court I think called them barbaric.  And there

17  needs to be punishment and there needs to be deterrence and we

18  need to promote respect for the law.  But it's also true that

19  in this district the average sentence for a case under this

20  statute, under the most recent statistics that we have, that

21  the average sentence is 24 months.

22          THE COURT:  But that doesn't discount for where in the

23  guidelines, right?  Some guidelines are lower than the

24  guidelines here, which is 10 years, pursuant to Section 5G1.1.

25  And others, at least the ones you cited, many of them had

1    guidelines that were lower than that, right?

2          MS. CROSS-GOLDBENBERG:  I am going to talk about them

3    in a second, your Honor.  I want to make a couple of different

4    points on this front.

5          One of them is that 24 months can be a sufficient

6    sentence to provide just punishment, to provide general

7    deterrence, to promote respect for the law, and we have seen

8    that across this district over and over and over again in cases

9    of this nature.

10          You know, every case is unique and, like I said, I

11   want to go into a couple of the things that make this case

12   unique and also sort of guideline applications.  But to some

13   extent it is possible to compare the punishment imposed for the

14   same conduct across cases, I think that's what the statute

15   requires, in order to avoid unwarranted sentencing disparities.

16          When you think about the factors that go into

17   sentencing, I think almost every factor cuts in favor of Mr.

18   Bennett; that is to say, cuts in favor of, if there is going to

19   be a sentencing disparity that's warranted, in his case it

20   would be a lower sentence, as opposed to a sentence that's

21   higher than average in this district.

22          The Court asked about the guidelines in those cases

23   and I think there is a couple of things.  First, in some of

24   those cases that I cited in my letter, probation did determine

25   the same guideline range it determined in this case, the 97 to

1    121 months, which becomes 220 months, of course.

2             But in other cases, your Honor, and in fact I would

3    suggest in almost all those cases, the guidelines ranges are

4    the result of negotiated plea agreements.  And what you see

5    there is the fact that in a case like this, in a general

6    file-sharing case, run-of-the-mill file-sharing case, which is

7    essentially what we have here, these guidelines enhancements

8    could apply in any case.  Whether the parties reach a

9    agreement, let's say they didn't apply or the government didn't

10   seek that they applied, they could apply in almost every case.

11   I think to the extent that the guidelines on paper end up being

12   different, that doesn't necessarily mean that there is a

13   dramatic difference in the conduct.

14            In some of those cases, your Honor, and I am going to

15   talk about three in particular, but the government insisted on

16   the mandatory minimum, for example, on the charge that carried

17   the mandatory minimum, or the government requested a guidelines

18   sentence.

19            I think it says something about the relative

20   seriousness of Mr. Bennett's conduct, not to say that it's not

21   serious, but within this realm we are talking about, the

22   government both exercised its discretion to not charge the

23   mandatory count and to recommend a below-guidelines sentence.

24   And the Court has enough experience to know that that is a

25   reflection of the government's view of the seriousness of the

1    case and of his culpability.

2         There are some cases where the government says no.

3    The judge should not even have the discretion to consider a

4    sentence below five years because this is so serious.  And in

5    this case the government didn't say that.  They said, we think

6    the judge should have the discretion to consider a sentence

7    above five years, meaning, it's not the case that anything less

8    than five years would be inadequate.  I think it's important to

9    look at it that way in terms of, to the extent that we are

10   comparing conduct at all.

11        Your Honor, the two cases that I cited in the footnote

12   in my December 2 letter that had that guideline range of 97 to

13   121 months, just what I could tell from the sentencing

14   transcripts of those cases, the *Bogdadhi* case contained over a

15   thousand images.  There were 129 images and 68 videos of known

16   victims, and in that case the defendant had been downloading

17   child pornography for 17 years, 17 years.  Judge Abrams said it

18   was a very serious case, very serious conduct, that there was a

19   need for general and specific deterrence, and she sentenced him

20   to 18 months.

21        As part of the sentencing in that case she referred to

22   conversations she had with the sentencing submission where they

23   told her that from 2006 to 2013, the average sentence in this

24   district for Mr. Bennett's charge was 36 months and that in

25   2013, which was the last year for which she could get the data,

1    it was 24 months.  That goes to say that you can provide

2    adequate deterrence, promote respect for the law and just

3    punishment with the average sentence being 24 months.

4          The *Landa* case, which was a very recent sentencing in

5    front of Judge Woods, there were 146 images, 106 videos.  In

6    that case the government sought a guidelines sentence, which to

7    me says they viewed that conduct as relatively more serious

8    than they viewed Mr. Bennett's conduct, and there Judge Woods

9    imposed the average sentence, 24 months.

10         This Court recently imposed a sentence in a case that

11   did involve the five-year mandatory minimum in the case of U.S.

12   v. Steven Bryan.  That case, from the Court's comments from the

13   sentencing transcript, there were 4,000 images involved, which

14   I assume reflects the multiplier of 75 videos, but I couldn't

15   quite tell.  But in that case the defendant kept materials on

16   an external hard drive to help avoid detection.  The

17   government, and this makes my earlier point about the

18   guidelines, in its sentencing submission the government

19   referred to at least one video that had rape in the title.  It

20   was a video of rape.  And yet in that case the four-level S&M

21   enhancement was not applied.  I don't know.  The parties

22   negotiated it out maybe.  But it wasn't applied.

23         We can't just take the guideline ranges that are on

24   paper in these cases because more and more I think the U.S.

25   Attorney's Office is recognizing that under *Dorvy*, throwing the

 1    book and throwing every guideline in a case is not the way to

 2    go, even though on their face, just like in this case, they

 3    apply.

 4            In that case, not only did the government not drop the

 5    five-year mandatory minimum, there was a suggestion at

 6    sentencing from the Court that one of the factors that the

 7    Court weighed negatively was the fact that the defendant had

 8    put himself in a position to be around children through his

 9    jobs, and there was some suggestion that maybe there had been

10    inappropriate touching involved in his care or oversight of

11    children.  In that case, also, there was an argument that he

12    had not fully accepted responsibility, that he blamed the

13    government for his conduct or for his arrest and for the

14    situation that he was in.  He lunged at the prosecutor,

15    apparently.  There were all sorts of negative factors that

16    would go above and beyond anything in this case.  In that case

17    the sentence was 66 months.

18            It's hard to see why Mr. Bennett's case, when you look

19    at all of the positives, why his case would require 18 months

20    of additional punishment, over and above that case.  And so I

21    think this is all new information.  I think they are all much

22    more recent cases than we had when we were here two years ago.

23            And, yes, the conduct here is serious, and no one has

24    ever denied that, and Mr. Bennett certainly has not shied away

25    from that.  As we discussed at the first sentencing, the

1    punishment has to be just punishment, it has to be fair, and it

2    has to take into account the nature and circumstances of the

3    offense, but it also has to take into account Mr. Bennett's

4    history and characteristics.

5           I just wanted to talk about three categories of things

6    that I think make this case so different, and it's not just

7    that it makes it different in the sense that it's all positive.

8           THE COURT:  Can I interrupt you for a second.  The

9    government cited cases that weren't in your letter in which

10   high sentences, 100 months or more, were imposed.  And so I was

11   just curious if you intended to distinguish those.  100, 108,

12   151 months.

13          MS. CROSS-GOLDBENBERG:  Your Honor, I don't have all

14   the aggravating factors from those cases.  And if the Court

15   wants them, I'm sure --

16          THE COURT:  I'm just saying each letter referenced

17   cases, cases that go low or go high, depending on one's point

18   of view.  The government in footnote 1 on page 2 of its letter

19   cites several cases, *U.S. v. Wallace*, *U.S. v. Yingst*, and *U.S.*

20   *v. Forrest* in which the sentences were much higher than the one

21   that I imposed.

22          MS. CROSS-GOLDBENBERG:  Your Honor, I'm not sure that

23   all those cases are Southern District cases or even --

24          THE COURT:  They are Second Circuit cases.

25          MS. CROSS-GOLDBENBERG:  I see the Second Circuit in

1    the citations, but I don't have all those aggravating factors.

2    You know, it's only by looking at all of the factors in the

3    case that we can determine what the right sentence is.

4            But my point in referring to those three cases

5    specifically is that that can be enough.  It's not a situation

6    where the only way to reflect the seriousness of this conduct

7    or to provide adequate punishment has to be a sentence of seven

8    years.  I didn't even go into all the cases in this district

9    where district judges have imposed sentences of probation.  I

10   had one within the last year where a defendant got one year of

11   probation.  That's to say that those general factors that are

12   supposed to apply across the board can be met with a sentence

13   much lower than the one initially imposed in this case.

14           Then the question is, is there a reason for a

15   disparity.  Is there a reason that Mr. Bennett's sentence

16   should be different than the average.  I think that the three

17   reasons that his sentence should have been different from the

18   average is information that courts don't usually have in cases,

19   and that is what makes this case really unique.  I'm talking

20   about his postoffense conduct, his postarrest conduct, and now

21   his postsentencing conduct.

22           With respect to the postoffense conduct, your Honor,

23   again, I'm talking about not postarrest, but postoffense, those

24   eight months between February and October of 2013, from the

25   time the agents seized his devices, there were eight months and

1    when he was arrested they seized all his new devices, and there

2    was no contraband, there was no pornography.  And that speaks

3    volumes about the deterrent effect of the initial search and

4    how much punishment is necessary to effect those objectives.

5    The initial search promoted respect for the law, initiated

6    rehabilitation, got him moving down the road.  Certainly it

7    deterred him from additional conduct.

8           The Court doesn't always have that information in the

9    case because there is not always that lag time.  There was a

10   case that I cited in my 2014 letter that had that similar fact.

11   There was a lag of several months between the initial search

12   and the arrest.  And when that defendant was arrested, this was

13   the Hector Garcia case in front of Judge Jones, when that

14   defendant was arrested, there was new child pornography on his

15   computer.  That was referred to in the complaint.  And Judge

16   Jones imposed probation in that case.

17          And so I think that postoffense conduct really stands

18   out.  His postarrest conduct I think stands out as well.  There

19   was 11 months of compliance with his pretrial release.  There

20   were no attempts to look at pornography.  He stopped smoking

21   marijuana.  He engaged very seriously in treatment.  He wore

22   the ankle bracelet and was on home detention.  And his

23   performance on pretrial supervision went beyond mere

24   compliance.  He had two jobs and I know the Court read some of

25   the astute evaluations that I had attached to my original

1    sentencing letter.  He made very serious efforts at treatment.

2    He wasn't going through the motions.  He just wasn't doing what

3    the Court told him he had to do.  He was really committed to

4    progress.  Again, Dr. Barday at the time concluded that he

5    wasn't dangerous, he wasn't a pedophile, that there was no risk

6    of recidivism.  This was all very powerful evidence in favor of

7    community-based supervision, and Mr. Bennett's opportunity to

8    continue treatment.

9         I think now the big piece that we have and the new

10   information is the postsentencing conduct, and we have seen

11   that Mr. Bennett has done all that he could.  He completed

12   RDAP.  He's continuing in the nonresidential program.  And as

13   part of RDAP he really had to delve deep into his conduct, into

14   the root causes and into how to avoid behavior like that in the

15   future.

16        Although it's a drug and alcohol program, it's much

17   more than simply a rehab or abstinence program.  It really,

18   really changes the way and teaches you how to change the way

19   that you approach decision making.  And I know Mr. Bennett

20   talked about this a little bit in his letter.  He can probably

21   describe it better than I can.

22        One thing that struck me in reading the transcript of

23   the last sentencing was the Court talked about how in viewing

24   these images Mr. Bennett didn't take into account the humanity

25   of the children.  And that is something he had to do as part of

1   RDAP, something he had to specifically do as part of RDAP.  He

2   had to write them letters.  Obviously they are not letters that

3   they will ever actually get, but it was an exercise.  He had to

4   write letters to the victims and he had to put himself in their

5   shoes and understand how not only the initial act of the

6   filming or the photographing affected them, but how file

7   sharing affected them and how these later cases might affect

8   them.  He had to put himself in their shoes and really confront

9   the impact of his conduct.  That's powerful.

10          And I think the records from the BOP that we were able

11  to obtain are truly amazing.  The Court and I'm sure the

12  government have a little bit of a different experience than we

13  do in terms of getting things from the BOP because it's

14  probably much easier to get them to comply with your requests.

15  But for us it's very difficult to even get to the right person,

16  let alone to get them to respond or to do something over and

17  above their job responsibility.  The fact that here two BOP

18  employees, they didn't just send us records that already

19  existed.  They took the time to write letters about Mr.

20  Bennett.  I think that speaks volumes to really how much they

21  saw in him, the effort that they saw him putting out, and

22  really the positive review they wanted to give him.

23          Dr. Wood, who I sort of quoted at the beginning and

24  whose letter is attached as Exhibit C to my December 2 letter,

25  she wasn't still treating Mr. Bennett at the time that we

1    reached out to her or in connection with this resentencing.

2    She actually had moved to a BOP facility in Kentucky and she

3    was still willing to take the time to support him and help him

4    out.

5            And I think the letter, which I think is attached as

6    Exhibit D, from drug treatment specialist Kinard is actually

7    given in a very BOP way.  The story behind that letter is very

8    telling.  When our amazing paralegal, Kate, who I know had to

9    run out to the MCC, first reached out to him, he said, yes, he

10   would send in something showing that Mr. Bennett had completed

11   the program.  He sent us a letter marked Exhibit D and it just

12   has the word successfully in it.

13           Kate called him and said, is there anything you can

14   tell us about his completion of the program?  And he said, yes,

15   yes, very enthusiastic.  Sent her back the letter that said he

16   successfully completed the program.  And Kate thought, OK,

17   that's not as much detail as we were hoping for.  And she

18   didn't call him or do anything.  And shortly thereafter she got

19   another e-mail from him and he said, disregard the last letter

20   and use this one, and he had bolded successfully.

21           It seems minor, but to us, in our experience in the

22   way that BOP employees see our clients and treat our clients

23   and the minimal steps that they are willing to go to to even

24   recognize their humanity, the fact that he took the time to not

25   only tell us that it was successful, but to then make the

1   further effort to bold successful.  He just wanted the Court to

2   know that Mr. Bennett has been very successful in the program,

3   and I think in a small way that really does speak volumes to

4   how special he is and to how extraordinary his postsentencing

5   conduct has been.

6          I know, as the Court said, and as I said earlier, his

7   performance may be exceptional, but none of us should be

8   surprised by it.  The last four years have demonstrated how

9   unique he is.  It's been almost four years since he had

10  anything to do with child pornography, since he had anything to

11  do with the conduct in this case.  And that is so much more

12  information than most judges have when they sentence someone.

13  It says so much about whether any or how much prison time might

14  be necessary to deter a person or to rehabilitate a person, to

15  punish a person.  It shows that those objectives of Section

16  3553(a) have been met.

17         Mr. Bennett has been in custody since September 5 of

18  2014.  It's more than 27 months.  In terms of pure numbers,

19  that's longer than the average sentence in a case like this in

20  this district.

21         The question the statute asks us today is whether

22  that's sufficient.  And I submit, as the Court knows, that it's

23  more than sufficient, based on the facts of this case, which

24  include the offense conduct, but also include the trauma that

25  led him to that offense conduct and his exemplary conduct over

1    the four years since.

2              Based on all of this, your Honor, we respectfully

3    request that the Court impose a sentence of time served.

4              THE COURT:  Thank you, Ms. Cross-Goldenberg.

5              Ms. Choi, is there anything that you would like to

6    add?

7              MS. CHOI:  Your Honor, I'll just be brief because I

8    think my submission in anticipation of this resentencing sets

9    forth the government's position.

10             We think that this is a limited resentencing based on

11   a procedural error that was noted by Judge Calabresi sua sponte

12   for the first time in oral argument.  It's very limited in its

13   scope.

14             I think that the Supreme Court's decision in *Pepper*

15   instructs that the Court has to obviously consider the 3553(a)

16   factors, including all of the considerations that

17   Ms. Cross-Goldenberg has set forth regarding the defendant's

18   postsentencing rehabilitation, but ultimately the question is

19   what weight to afford each of those factors, something that is

20   traditionally put into the deference of district court judges.

21             The government cited cases which where on appeal, even

22   if the defenders or individual Second Circuit judges may

23   disagree about what sentence they would have imposed had they

24   been in your shoes, these were significant sentences based on

25   offense conduct that due to the advisory sentencing guidelines

1   in those cases suggests similar to what happened in this case,

2   and those sentences were readily affirmed.

3        The only difference between what is happening now and

4   what happened two years ago is the ability for the defendant to

5   put forth these postsentence rehabilitation letters and reports

6   which show that the defendant is clearly on the right track.

7   But whether or not that warrants a material change is really up

8   to the discretion of you, your Honor.

9        And we think that resentencing the defendant to the

10  same sentence that you had imposed prior would be within your

11  discretion.  It would also be within your discretion to give

12  the defendant credit for the efforts that he has made if you

13  think that that warrants a material change in the way in which

14  to weigh those individual factors.

15       Other than that, I don't know if you have specific

16  questions.

17       THE COURT:  There was a lot of time spent in both

18  Ms. Cross-Goldenberg's written submission and today about these

19  other cases where other judges in this district appear to be

20  giving lower sentences.  You countered in your letter with

21  cases in this circuit, including this district, where courts

22  have imposed higher sentences; in other words, guidelines

23  sentences, within guidelines sentences, or discounts that are

24  not significantly below the guidelines range, for example.  I

25  don't know if you have any response to the cases she has cited.

1              MS. CHOI:  Your Honor, let's be clear about a few

2     things with regard to the defendant's cited cases.  I think I

3     made this point in our submission, the government's submission.

4     The sentencing guideline ranges there are much lower than

5     ultimately, assuming that the statutory maximum didn't

6     otherwise cap the guidelines range, the 135 to 168 that would

7     apply in this case.  I think that would be a fair measure of

8     the type of offense conduct at issue here versus what happened

9     there.

10             I can't speak to whether or not these under 24-month

11    sentences are the average in the district.  I'm not aware of

12    that fact.  I tried to talk to the child pornography and sexual

13    exploitation of children coordinator.  Tried to gather that

14    data.  I was unable to do so prior to the deadline for my

15    submission.  I apologize for that.

16             The point here is, there are other sentences that are

17    more significant than that that are not cited there, cases that

18    I have myself prosecuted.  And I think the Second Circuit cases

19    that I've cited, although I can't represent that they are all

20    Southern District cases, the question on appeal is whether or

21    not there is substantive unreasonableness in those sentences.

22    Those ranges are more in accord with the offense conduct that

23    occurred in this case.  Obviously, there was no statutory cap

24    necessarily in some of those cases.  But I think it shows that

25    there can be a wide range of sentences that can be within that

1    range and it really just depends on the Court's individual

2    weighing of those 3553(a) factors.  It's not a per se rule.

3          I think Ms. Cross-Goldenberg also mentioned this case,

4    I think it was before you, that she suggested that wasn't cited

5    in the footnote, this *Bryan* case where there could have been an

6    enhancement with regard to S&M that wasn't in fact imposed.  I

7    can't speak to why there may have been pleas that are reached

8    in other cases but I can say here, there was no plea agreement.

9    This was a guidelines range that was affirmed by the Second

10   Circuit.  I think that that guidelines range shows that this is

11   what applies and, of course, the guidelines range is but one of

12   several 3553(a) factors that the Court should take under

13   advisement.

14         I do think it is sort of a metric by which you can

15   weigh the severity of the offense conduct.  It's very hard to

16   say in the abstract what exact factors applied in those cases

17   that spurred those district court judges.  The question really

18   is whether or not the Court in this case believes that the

19   weight that is afforded the offense conduct in this case bears

20   the sentence it ultimately imposes.  There are ample cases in

21   which the Second Circuit has affirmed much more significant

22   sentences than the one the Court has imposed in this case

23   against the defendant.

24         THE COURT:  The *Bryan* case I'll just point out, that

25   sentence was within the guidelines range.  It was 66-month

1    sentence where the range was 63 to 78 months.

2           Every case is different and as I said in that case and

3    as I say in this case previously, and I'm likely to say again,

4    I don't view the guidelines as a precise instrument, an

5    instrument that is to be followed at all costs.  I think it

6    provides some insight.  I think it's worth considering.  In

7    fact, I have to consider it.  But it doesn't dictate any

8    sentence that I impose.

9           Just in case the record wasn't clear in the *Bryan*

10   case, the guidelines range was much lower and the sentence

11   imposed was within the guidelines range and above the bottom of

12   the range.  Here, obviously, in this case initially I sentenced

13   Mr. Bennett to a sentence that was 30 percent lower than the

14   guidelines range.

15          MS. CROSS-GOLDBENBERG:  I think, your Honor, just with

16   respect to that *Bryan* case, my point there was that it

17   highlights that actually the guidelines are not a fair measure

18   necessarily of the underlying conduct.

19          THE COURT:  I don't think I dispute that they are not

20   necessarily -- they may well often be a very clumsy instrument.

21   I've always thought that.  But just to compare apples to

22   apples, I'm just saying, that is a case in which it was a

23   guidelines sentence.  It wasn't like some of the others that

24   you talked about where they were well below the guidelines.

25          MS. CROSS-GOLDBENBERG:  Right.  But it was also the

1   case where, as I said, the government in its sentencing

2   submission referred to videos not just that depicted rape, but

3   had rape in the title.  Yet, the four-level enhancement for S&M

4   did not apply or was not applied.  And so his guideline range

5   would have been much higher, years and years higher, if those

6   four levels had been added.

7         THE COURT:  I don't know of the reason why they

8   weren't.  I just don't know.  It wasn't an issue, didn't come

9   up.

10        MS. CROSS-GOLDBENBERG:  Possibly because the parties

11  negotiated it out.

12        THE COURT:  I don't think parties can't negotiate

13  facts out.  They can't negotiate away evidence that's obvious.

14  I don't know at this point.

15        MS. CROSS-GOLDBENBERG:  That was my point with respect

16  to that, your Honor.

17        I think, if it's OK with the Court, Ms. Cassidy does

18  have something she would like to add.

19        THE COURT:  That's fine.

20        MS. CASSIDY:  I would like to respond to the

21  government's statement about the remand of limited scope.  It's

22  not.  It's a remand for a resentencing which the Court can

23  consider every aspect of sentencing.  This is nothing limited

24  about it.  The Second Circuit was clearly troubled by the

25  overall length of the sentence.

1          THE COURT:  They reserved on the issue of substantive

2     unreasonableness.

3          MS. CASSIDY:  They did.  And they emphasized that they

4     are taking no position at this time.  Obviously, that was a

5     troubling sentence to the Court, considering all the

6     circumstances.

7          THE COURT:  You are saying I should read into that,

8     that they are winking and nodding at me that I should give a

9     lower sentence because otherwise maybe they will slap me down

10    on substantive unreasonableness?

11         MS. CASSIDY:  I think that they have explicitly

12    reserved on substantive unreasonableness.

13         THE COURT:  I don't think I should infer one way or

14    the other whether they are signaling me that they think this is

15    substantively unreasonable.

16         MS. CASSIDY:  I think that the emphasis that we are

17    taking no position at this time is sort of an implication of

18    that.

19         THE COURT:  I wish they would be direct then.  Maybe

20    you know better than I.  You were there.  Did he wink?  Did

21    Judge Calabresi give you a signal of some kind?  Did he say

22    something off the record?

23         MS. CASSIDY:  No.  I think it's implicit in that

24    footnote that they are emphasizing -- they are taking no

25    position on the substantive unreasonableness at this time, and

1    I think they were clearly troubled by the length of the

2    sentence.

3          THE COURT:  What should I do from that, from the fact

4    that you have inferred that they are troubled?  How troubled do

5    you think they were?  Do you they were 30 percent troubled, 40

6    percent troubled?

7          MS. CASSIDY:  I think the same as

8    Ms. Cross-Goldenberg --

9          THE COURT:  I'm asking you to tell me what they were

10   thinking because you seem to have this insight that none of the

11   rest of us have.

12         MS. CASSIDY:  I don't know specifically.

13         THE COURT:  Maybe we should drop that as a subject.

14   What do you think.  To try to read the minds of judges who

15   didn't even touch on the subject of substantive

16   unreasonableness.  Maybe we will just leave that for another

17   day.

18         MS. CASSIDY:  My main point was that there was nothing

19   limited about the scope of it.

20         THE COURT:  Yes, and I think that's true.

21         MS. CHOI:  Your Honor, I misspoke.  I just meant that

22   the only error that was identified was limited to the

23   procedural error that was elucidated in the opinion itself, not

24   that the Court would be limited in any way about what sentence

25   it should impose at this time.

1          THE COURT:  I understand the purpose of the remand, I

2    understand the scope of my discretion, which is significant,

3    and I certainly understand the importance of what I do and what

4    I'm doing here today.

5          Anything else we should cover?

6          Mr. Bennett, as I said, you have a right to speak if

7    you'd like.  Is there anything you would like to say?

8          THE DEFENDANT:  Yes, please.  I didn't really write

9    anything.  I just want to address the Court and I want to keep

10   it brief.  I've spent a lot of time over the last two years

11   thinking about everything that has occurred, and I've taken it

12   very seriously.  And I've spent a lot of time honestly just

13   crying.  And not with tears necessarily, but crying out for

14   forgiveness because I did what I did.  Because I looked at

15   those children and didn't respect them.  And in a sober mind

16   and in a clean heart now, I see what I did four years ago

17   differently.

18         And I've honestly sought -- I don't know them and I

19   probably will never know them, but I sought forgiveness and

20   sought mercy and grace.

21         The funny thing is, so many days I would lay in that

22   cot looking at the ceiling or in the shower thinking about, if

23   this day would ever come, what I would say to you and now I'm

24   here and the words kind of escape me.  I think what I really

25   just want to say is that I have taken this seriously, and I

1   understand what I did.  I really do.  And I know you have a job

2   to do.  I know the prosecutor has a job to do.  And I respect

3   that as well.

4        But I am asking for mercy because I didn't just go

5   through the motions.  I feel like I've done the work.

6        There were some breakthrough moments for me when I was

7   in the RDAP program.  I know it's a drug treatment program.

8   It's really about criminal thinking.  There was a moment we

9   began talking about things like this.  And I remember they said

10  that every time that there is a video that's identified, a

11  person who is in one of these child pornography videos that is

12  identified, even if they were an adult, some federal agent has

13  to come and say, is this you?  That was a breakthrough moment

14  because it just made me think, wow, I was a part of that.

15       What I did was wrong and it was never my intention to

16  be a part of something like that.  Nobody wants to be

17  potentially even within the same sentence as a pedophile.

18  Nobody grows up and has urges and temptations that they don't

19  know to do with and does certain things and wants to go down

20  this road and not take responsibility for it.  I take full

21  responsibility for it.  But I'm asking for mercy because I

22  think there is room for mercy here.

23       Two years ago, when I sat here and I had to hear

24  everything that was said and you said what you said, I am just

25  being honest, I wasn't angry, but it was constructive anger,

1    your Honor.  I wasn't angry at you.  I didn't agree with

2    everything, and I still don't necessarily agree with

3    everything.  But it was an anger that I turned on myself to

4    say, I don't want for the rest of my life to be remembered as

5    this person.  I didn't want to be a lawyer to grow up and be

6    this guy or be seen as this guy.  So when I went into prison I

7    really sought to do the work.  I mean, the letter that Dr. Wood

8    wrote, I really appreciate, she was the head of the RDAP

9    program and I also went to her for voluntary treatment, and we

10   talked about all of my issues, things I never discussed before

11   and things I will definitely not discuss publicly here.

12        But throughout this process it's been a long journey.

13   And some of the things you said I needed to hear at the time

14   because I listened and I read the transcripts.  I went to

15   prison.  I mean, I know you probably don't get to talk to

16   people after they are sentenced.  That month after I was

17   sentenced, I couldn't even eat.  I ate a little bit.  I

18   couldn't sleep.  I couldn't move.  I'm talking to my mother.  I

19   felt just like I just totally shattered her world.

20        And this changed me.  You know, I'm not that young.  I

21   was two years -- I was in this activity for one year.  I was

22   two years out of law school.  It was a long journey to get

23   there, looking at regular pornography, but it was all pushing

24   the limit.  And I was young.  And this is not to minimize what

25   happened, but I was dumb.  You're two years out of law school.

1    I spent my whole life in school and then three years later I'm

2    in prison.  And I look up and I'm like, what was life about?

3          And I've come to realize, life isn't about positions

4    or titles or accolades or where you went to school or how much

5    money you have.  It's about being a pleaser.  I will say it to

6    the lord for forgiveness, and that's part of the reason I'm

7    here, because somebody heard my prayers.  I mean, honestly

8    somebody heard that I'm sorry and that my heart -- I'm trying

9    to be clean and trying to be pleasing.

10         You said last time, and I agree, this is bigger than

11   my personal journey.  Prison will show you that.  Prison.  I'm

12   in the cell with -- I met so many people.  I've seen stabbings.

13   I've seen sexual assaults.  I have been in the room with old

14   men passing blood in the middle of the night on the toilet and

15   you're begging for a CO and the CO laughs or jokes.  Just two

16   days ago they pulled somebody out in a stretcher and I

17   understand that no matter how much one does in life, one bad

18   decision can destroy everything.  That's the lesson I get

19   beyond what I did to get there.

20         And so that's something I know one day I will be

21   released and my prayer is that it will be today.  But whenever

22   it is, whenever I'm released, I'll always remember that lesson,

23   that what we do in private -- my mom was the one who told me --

24   matters.  That's the only thing that matters is that I'll be

25   pleasing and that I go back to the roots that my mom instilled

1    in me from the beginning, fear and respect of the lord.

2            And I think -- you know, I learned in treatment the

3    difference between guilt and shame.  And guilt is feeling bad

4    about what you did and I always feel guilty about it.  But

5    shame is feeling bad about who you are.  I couldn't even turn

6    around that last time.  It was three hours and I just heard my

7    mom wailing behind me.  I couldn't even look at her because I

8    was ashamed.

9            I'm no longer ashamed because I know in my heart that

10   from the moment these agents banged on my door in February

11   2013, I've been doing the work, and I have taken everything

12   seriously and I have heard everything that was said, and I've

13   come to be at a different place.  I will just leave it at that.

14   I'm asking for mercy and I'm asking for grace.  I'm asking for

15   grace, knowing that nobody deserves it.  But because I know,

16   one, this will never happen again.  This will never happen

17   again.  Two, because I am a changed person.  I hated prison,

18   but I learned from prison.  And it's something that will always

19   stick with me, no matter what I become in life.  I will never

20   think more highly of myself than what I am.  Because in the

21   grand scheme of things I'm nothing and nobody.  And there is

22   nothing that I can do that matters if I don't take care of

23   what's meaningful first.

24           That's all I want to say, Judge.  Thank you.

25           THE COURT:  Thank you.

1          MS. CLARKE:  Can I say something, Judge?

2          THE COURT:  Sure.  Let's have you come up.

3          Marshals, OK if she comes to a microphone just so I

4   can hear Ms. Clarke and so the court reporter can hear

5   Ms. Clarke.

6          MS. CLARKE:  Thank you, your Honor.

7          THE COURT:  Could you state your name for the record

8   so the court reporter has it down.

9          MS. CLARKE:  My name is Wanda Clarke.  I'm Darrell's

10  mom.

11         So, your Honor, I don't even know where to begin.  But

12  what I will say is, first of all, I don't make any excuses for

13  what Darrell did.  I don't condone his behavior.  It was wrong.

14  He knows it was wrong.  I know it was wrong.  He knows how much

15  what he did affected me.  But Darrell has always been -- he's

16  the best thing that ever happened to me.

17         All of this didn't start in 2013.  He has been

18  depressed for a long time.  It was only a matter of time before

19  something happened.  As a mom I felt so helpless.  I didn't

20  know what to do.  I didn't know how to help him.  He was in New

21  York.  I was in Virginia.  I knew he was struggling.  He had

22  finished law school.  He couldn't find a job.  Nobody would

23  hire him.  Either he was overqualified or the first time he

24  didn't pass the bar, so he couldn't get a job as a lawyer.  So

25  he had all of this pressure on him.  I'm not making excuses,

 1    your Honor.

 2            I just want you to understand, he had all this

 3    pressure on him, pressure from his family, from his peers, from

 4    friends and from enemies.  He just had pressure to perform.

 5    And every rejection, I knew he was sinking further and further

 6    into depression and I didn't know how to help him.  I didn't

 7    know what to do.

 8            There were times, and I told you in that letter, when

 9    Darrell was sentenced two years ago, it crushed me.  But it

10    probably took me a month to realize that that might have saved

11    his life.

12            I realize that I wasn't afraid for the phone to ring.

13    It was years when Darrell would call and because I knew he was

14    so depressed, the phone would ring and it would be a New York

15    exchange.  I didn't know what to expect because he was so

16    depressed.  And he was all crazy about hurting himself.  There

17    were times when I would call his friends because I couldn't get

18    in contact with him.  Please check on Darrell.  I'm in

19    Virginia.  He wouldn't answer my calls.  I didn't know what to

20    do.  I knew it was only a matter of time before something

21    happened.  I thought maybe I would be saying good-bye to him.

22    I thank God that he's still here today.

23            Unfortunately, we are here.  I would have never

24    thought that this is where we would end up.  Your Honor, you

25    talk about a deterrent.  We are talking about a kid who worked

1    his entire life.  He went -- he's been in school forever and he

2    has worked hard -- he went to undergrad, graduated as

3    valedictorian, went to Harvard Law, and he lost everything.

4    Talk about a deterrent.  He lost everything.  He still has to

5    start from ground up, from the bottom up.  And I know it

6    doesn't make it right.  We are not talking about a normal case.

7    I don't know.  Your Honor, I just ask you to please consider

8    everything.

9          I think we are before you today.  There is a reason

10   that we are here before you again today.  And I think it's

11   bigger than any of us in this courtroom.  Darrell, he worked

12   hard after he got sentenced.  I was probably -- it took me a

13   lot longer than it did him to decide that he wanted -- that he

14   was going to do right.  They sent him to Virginia.  He went

15   through the program.  And he was determined he was getting into

16   that program and he was so excited.  And I watched him over the

17   year that he was in RDAP.  I was in Virginia at the time.  He

18   was in Virginia and I visited him every other week.  And I

19   watched him grow and I watched the light return to his eyes.

20   And I watched the depression, and I felt like I had my son

21   back.

22          Then the program ended.  Now what?  There is nothing

23   else out there.  I would love nothing more than to take my baby

24   home with me to Miami, to Florida, which is where I am now, so

25   he can begin to rebuild his life.  He has lost everything.  He

1    has got a lot of rebuilding to do.

2        That's all.  Thank you, your Honor.

3        THE COURT:  Thank you, Ms. Clarke.

4        What I'd like to do is take a short break.  It's been

5    very emotional and maybe people can just catch their breath.

6    If they need a tissue or something, that's fine, or have a

7    drink of water.  About five minutes.  I am going to collect my

8    thoughts, also, think about what I've heard today and then I'll

9    come back and I'll announce the sentence then.  Thanks.  Thanks

10   for your patience.

11       (Recess)

12       THE COURT:  Thanks for your patience.  This is a

13   difficult day.  In some ways it's particularly difficult for

14   Mr. Bennett, who has had to sit through now two sentencings.  A

15   sentencing is a very traumatic day, both for an individual and

16   for his family, and I understand that.  And I appreciate people

17   who are here today, those who wrote letters and Mr. Bennett's

18   own statements.  I have high regard for the lawyers in this

19   case and I have high regard for Mr. Bennett and for his family.

20       I looked at my sentencing remarks from two years ago

21   and there is not very much I would change other than explicitly

22   stating a section of the guidelines.  But in terms of the

23   factors that I have considered and the thoroughness with which

24   I approached sentencing and the time and attention I spent in

25   this case, I think that was reflected and it's repeated here

1    again today.  I give this a lot of thought.  It's not something

2    I do reflexively.  I don't slavishly follow the guidelines.  I

3    think it's inappropriate to do so and I have never done it.

4            I've talked about the various factors that I am

5    required to consider and I consider them all.  And that was

6    true two years ago and it's true today.  Two years ago I

7    certainly was of the view that Mr. Bennett was -- I think the

8    words I used were precious and I believed that.  This is a

9    really precious life and a life that matters and a person of

10   tremendous talent and ability who has much to offer and will, I

11   have no doubt, do much to improve the lives of other people in

12   the world.  I believe that.  And so I begin with that.  And

13   that was something that I was impressed with before and remain

14   impressed.  He is not typical.  I don't know if there is a

15   run-of-the-mill file-sharing case.  I don't really think there

16   is because every case has a unique defendant and unique facts.

17   This case is certainly unique.  Mr. Bennett is certainly a

18   unique individual.

19           In this case I certainly gave him credit two years ago

20   for the things he had done postoffense, postarrest, and up

21   until the point of sentencing.  That was the universe of

22   information I had.  I gave him credit for it because I think it

23   deserved credit.  It was impressive.  And that was, in large

24   part, why I departed the way I did, the reason I imposed the

25   sentence below what I would otherwise have imposed, guidelines

1    or no guidelines, given the conduct.  That's still true today,

2    but maybe it's worth just sort of spelling out that certainly I

3    accept and credit the things that Mr. Bennett said.

4          Mr. Bennett, you said that you take full

5    responsibility for what you've done.  I think that's true.  I

6    think that was true two years ago.  But if it's possible to be

7    more true today, I think it is.  You said that you've taken

8    this seriously since the sentencing, and I believe you.  You

9    said that you've not only taken this seriously, but you

10   understand what you did.  You've reflected on it.  You've

11   reflected on the humanity of the children involved.  You didn't

12   just go through the motions you said.  You said you were

13   ashamed, you were sorry, you sought forgiveness, and I credit

14   all of that.  I think that that's true.  And I think it's

15   admirable.  I think that's what one would hope from a defendant

16   who has been sentenced.  Although one may hope it, it doesn't

17   always come to pass.  But in your case it did.

18         Since then, since I last saw you, you've done I think

19   everything you could with what's available to you to improve

20   yourself, to grow, to be better, and to prepare for when you're

21   eventually released.  I give you credit for that.

22         I will say that the original sentence and the sentence

23   I imposed today is not really about incapacitation.  I don't

24   view you as a predator.  I don't view you as a pedophile.

25   There is no evidence to suggest you are those things and that's

1    not the driving factor for me in sentencing.  I don't think I

2    need to cage you to keep you away from people.

3         In some cases I do have to do that or I have to think

4    about that more.  It's not really the issue here.  It's not

5    really about specific deterrence.  I think you get it.  I think

6    you understand, as you said.  I think you've thought about this

7    and I think you've grown from it.  And I think that that is

8    reflected in the fact that in the time that you were out before

9    sentencing there is no evidence that you returned to any kind

10   of child pornography, and I think that says that you are not

11   someone who is likely to go back to this.  No one can know for

12   sure, but I think the evidence in front of me suggests that

13   this is not about really specific deterrence.

14        I do think general deterrence is part of it.  I do

15   think that there is a need to send a message to others who

16   might consider engaging in this kind of conduct, that the

17   consequences are dire and severe and the punishment will be

18   swift and certain.  I think that's important, to send that

19   message because hopefully it will have an impact on the way

20   others think who might be otherwise inclined to engage in this

21   kind of conduct.

22        But as your mother said, your story in which you've

23   really lost everything, everything you have worked your whole

24   life to attain, is in itself a cautionary tale and carries some

25   general deterrence impact beyond just the numbers of a

1  sentence.

2         This is not really about rehabilitation.  I think for

3  the same reason that it's not about specific deterrence, it's

4  not really about rehabilitation.  I think that you are moving

5  in a healthy direction.  That was true before I sentenced you.

6  It's, I think, more demonstrably true today.  Marginally more

7  because, as I said, I'm not that surprised by the things I've

8  read about you.  It suggested to me that I think I sized up

9  your character pretty well when I sentenced you two years ago.

10 In any event, I have more evidence today of those things and it

11 confirms what I thought before, that you are not a likely

12 recidivist.  You're not a person who is still in denial.  You

13 are not a person who is a predator.

14        What was the principal driver of my sentence the last

15 time, and maybe I should have been more clear about this, maybe

16 I wasn't enough, at a sentencing it's so easy to focus on the

17 defendant and obviously focus should be put on the defendant.

18 But there are other people who are, of course, relevant and

19 also central to what's going on, and that's the victims, and

20 the impact a crime like this has on very real victims.  None of

21 them are here in the courtroom.  They have not been able to,

22 for whatever reason, come here and speak face to face and

23 articulate what this crime has done to them.  But we do have

24 some evidence of that and my sentence the last time was in

25 large part about the specific harms caused by this crime and by

1    the need for a just punishment, something that will be

2    commensurate for a sentence that will be commensurate with the

3    harm.

4         And the harms here are very real and I've been

5    reluctant to sort of get into it sort of too much because some

6    of it is kind of ugly.  But the presentence report talks about

7    the various images in this case, and it describes them in some

8    detail.  And it's enough to make one wince.  It's really

9    difficult.  The videos and the images that were shared in this

10   case are really graphic and involve acts of violence against

11   young children.  Some of the titles convey this.  I'm reluctant

12   to say this because it's hard to hear and I know that Mr.

13   Bennett knows this already, but I think it has to be said

14   because that's central to assessing the harm.

15        But we are talking about files that were shared with

16   titles like Man Doing 10-year-old Ass; Oliver, 10 years old,

17   Enjoys Cum; VB Dad, Very Big Dad Plays with Little Boy; Man

18   Fucked 8-Year-Old Boy Nude, exclamation point; Men Playing With

19   Young Boy Nude; New Homemade Little Boy, 8 to 9 Years Old;

20   10-year-old Raped Like a Rag Doll in a Lot of Pain; 12-Year-Old

21   Boy Raped; Kid's 10-year-old Hole Widened and Being Fucked

22   Violently by Two Adults; another one called He Really Likes It,

23   No Wonder; Two Brothers 12 Years Old and 13 Years Old, Fucked

24   by Their Dad.

25        You get the idea.  These are brutal, brutal images

1    that were traded, downloaded, shared time and again.  And these

2    are human beings.  I know you have thought about this and you

3    understand this.  And I'm not here to wag my finger at you or

4    to get angry at you.  It's just to remind you of the human

5    lives affected by this.  There was a victim impact statement

6    that was provided in this case.  One of the children who

7    appears in one of the videos or images that was on your hard

8    drive that were shared by you.

9         And the question that these victims were asked

10   included this question:  What sentence would you like a judge

11   to order for someone caught sending, receiving, or possessing

12   sexually explicit pictures of you?  And one victim answered:

13   Thirty years in jail.  I wonder what his mother would say to

14   that question or what his friends would say to that question.

15        Here is another question he was asked as part of the

16   victim impact statement.  Is there anything else you would like

17   the judge to know about how you feel because of what has

18   happened to you?  The answer is tortured.  One of the images

19   that was involved in this case involved a victim who has since

20   been identified and is identified only as Andy.  It's not his

21   real name.  He was sexually abused by an adult between the ages

22   of seven and 12, now older, and there is submission of an

23   evaluation of him and it says -- I'll read partly from it.

24   Clearly, this child sex abuse images of Andrew have been widely

25   distributed and are very popular among those arrested with

1    child pornography in their possession.  The sexual acts

2    depicted include the full range of sexual acts from fondling to

3    oral copulation and anal intercourse.  It goes on to say:  "The

4    intensity of his, Andrew's, distress and the degree to which it

5    impairs his health and functioning will also fluctuate.  Andrew

6    started smoking cigarettes at age 12.  He has experimented with

7    various drugs, including alcohol, marijuana, and painkillers.

8    He used methamphetamine for almost a year.

9         Andrew talked during the interview of being "bugged

10   every day" with thoughts about not knowing if someone has seen

11   him on the Internet.  The report continues:  The sexual

12   exploitation is ongoing, sexual victimization without end.  The

13   ongoing stress of his knowing that the images and videos of his

14   sexual abuse are circulating blindly on the Internet make

15   healing and overcoming the sexual trauma more difficult.

16        I can't ignore that.  I can't ignore what has been

17   done to these children, both by those who made the images, who

18   are the most guilty, most culpable and deserving of the

19   greatest punishment of course, but also by those who shared

20   those images, who distributed them, who enjoyed them, and

21   perpetuated that victimization.  I don't think it's a passive

22   thing.  I don't think it's worth a five-day term of

23   incarceration, as Judge Weinstein recently found in a case.

24   That's different.  Every case is different.  I get that.

25        You heard the titles I just read.  They are

Footer

descriptive and self-explanatory, and they reveal victims who

are the most vulnerable in our society, who are then subjected

to abuse again and again every time somebody downloads the

images of their rape, of their abuse.

That's what went on here.  It went on for a while.

And it went on in a callous way.  And there is punishment that

has to come from that.  As I said before, and you remembered

it, and I don't mean it sarcastically or pejoratively, it's not

all about your personal journey.  I think you are a decent man

and I think you have very good qualities and I think you will

grow from this and you will move on.  I'm not sure Andy and

some of the other kids depicted in these videos will move on

ever.  You didn't rape them.  Of course you didn't.  But you

certainly harmed them in what you did, and there has to be

punishment for that.

Two years ago I concluded for all the reasons I'm

saying now that seven years was an appropriate sentence.  I

still believe that to be true.  However, I do think that with

the passage of two years and with the additional information

about what you've been doing, there has to be some reward for

good behavior.  There has to be some acknowledgement and

encouragement when I have additional information.  That has to

count for something.  It won't count for as much as

Ms. Cross-Goldenberg would wish for or you or your family would

wish for, and I respect that.  I understand that.  But for me

1   it entitles you to something and I think that something for me

2   is 18 months off of the original sentence.  To do more than

3   that I think would be to disrespect these victims and to

4   disrespect the enormity of the harms caused by this crime.  But

5   it still is a reflection, I hope and intend it to be a

6   reflection of your progress and a reflection of the qualities

7   that I talked about.  And so that's the balance I hope to

8   strike.  I don't know what the victims would say if they

9   learned of this sentence or my reasoning.  They might say this

10  is nonsense, that I don't understand their pain sufficiently or

11  haven't thought about it long enough.  I'm a human being.  I

12  have, I'm sure, my own weaknesses, my own failings and

13  sentencing is a hard thing to do.  We all do our best.

14          It's not surprising that we sometimes come out in

15  different places, and I don't think sentencing guidelines can

16  ever replace the judges tasked with this responsibility, and I

17  think this is why they put me on the bench was to exercise my

18  judgment.

19          For me that's the appropriate sentence in this case.

20  That's the sentence that I intend to impose.  It will be a

21  sentence of five and a half years, which will be 66 months.

22  All the other conditions of supervised release will remain.

23  All the other conditions, including restitution of a thousand

24  dollars to Andy, which was the subject of a prior order by the

25  Court.  Everything else will remain the same.

1        That's the sentence I intend to impose.  Is there any

2   legal impediment to me imposing that sentence?

3        Ms. Cross-Goldenberg.

4        MS. CROSS-GOLDBENBERG:  No, your Honor.

5        THE COURT:  Ms. Choi.

6        MS. CHOI:  No, your Honor.

7        THE COURT:  Let me ask you to stand, Mr. Bennett.

8        Mr. Bennett, you know how we got here.  Having

9   accepted your guilty plea, having sentenced you before, but now

10  on remand from the circuit having the opportunity to sentence

11  you again, I impose a sentence of 66 months' incarceration,

12  which is an 18-month reduction from what I had imposed before,

13  in light of all the things I talked about, with credit for the

14  time you've already served.  In addition, I will impose a term

15  of supervised release of five years with all the terms and

16  conditions previously imposed.  I'm happy to read them, but if

17  you don't think it's necessary, I won't.

18       MS. CROSS-GOLDBENBERG:  I don't think it's necessary,

19  your Honor.

20       THE COURT:  I will impose restitution of $1,000 to the

21  victim identified previously as Andy or Andrew.  In addition, a

22  $100 special assessment.  I am not going to impose a fine, of

23  course.

24       Are there any additional recommendations that you

25  would like me to make with respect to placement, now that his

```
 1   mom is in Florida?  Would you like him to go to Florida or

 2   someplace closer to Florida?

 3            MS. CLARKE:  Please.

 4            MS. CROSS-GOLDBENBERG:  If I can just have one second.

 5            Yes, your Honor.  If the Court would recommend that he

 6   be designated somewhere close to the Miami area to facilitate

 7   family visits with his mother.

 8            THE COURT:  I'm happy to make that recommendation.

 9            MS. CROSS-GOLDBENBERG:  I think the plan would be, as

10   she indicated, that that's where he would live with her when he

11   is released.

12            THE COURT:  I'll make that recommendation in the

13   strongest terms I can.  It's up to the Bureau of Prisons, but I

14   will certainly make the recommendation.

15            Is there anything else we should cover today?

16            You have a right to appeal this sentence.  If you wish

17   to appeal, you need to file a notice of appeal within two

18   weeks.  Probably two weeks from Monday.  I'll get the judgment

19   out on Monday.  Talk to your lawyers about that.  But I think

20   you're familiar with that process.  Thanks.  It's been a long

21   day.

22            Ms. Choi, anything else you've overlooked?

23            MS. CHOI:  Your Honor, I hate to bring up a few

24   things.  Just to make sure that we have dealt with all the

25   record issues.  Just that I presume that your Honor adopts the
```

1    factual findings of the PSR but for the guidelines range which,

2    as you said, was 120.

3           THE COURT:  Yes.  The circuit has already affirmed the

4    calculation.  I think the only thing that was remanded was to

5    make sure that it was crystal clear that the guidelines range

6    was 120 months, which is the statutory maximum, and, by virtue

7    of Section 5G1.1(a) of the guidelines, becomes the guidelines

8    range where the range otherwise calculated would be higher than

9    the statutory maximum.  I think that's clear, but I thought it

10   was clear the last time.

11          MS. CHOI:  I also don't think that either party has

12   any new PSR objections.  And I also would just be remiss, if

13   the Court could simply remind the defendant of his SORNA

14   obligations, so he remembers them.

15          THE COURT:  I should ask, no other objections to the

16   presentence report?

17          MS. CROSS-GOLDBENBERG:  Not from us, your Honor.

18          THE COURT:  As part of supervised release, once you

19   are released, you have obligations to report as a sex offender.

20   I think we talked about this last time.  This is an obligation,

21   so wherever you reside, you'll have to report and give notice

22   of where you reside and register as a sex offender.  And

23   failure to do that would be a crime and it's also a condition

24   of supervised release.  Is that sufficient?

25          MS. CHOI:  Yes, your Honor.  Thank you.

1            THE COURT:  Anything else?

2            MS. CROSS-GOLDBENBERG:  Not from us, your Honor.

3            THE COURT:  Thanks very much.  This has been a long

4    day and I know it's a very emotional day.  I have explained my

5    reasons and I certainly respect that people can disagree.  But

6    I'm really sincere when I wish you the best, Mr. Bennett, you

7    and your family.  Good luck to you.

8            THE DEFENDANT:  Thank you.

9            THE COURT:  Let me thank the marshals and the court

10   reporter as well.

11                              o0o

12

13

14

15

16

17

18

19

20

21

22

23

24

25